**STATE of Tennessee, Appellee,**

v.

**Harold Wayne NICHOLS, Appellant.**

Supreme Court of Tennessee,
at Knoxville.

May 2, 1994.

Order on Petition for Rehearing
June 20, 1994.

Hugh J. Moore, Jr., Rosemarie Bryan, Chattanooga, for appellant.

Charles W. Burson, Atty. Gen. & Reporter, Stan Lanzo, Dist. Atty. Gen., Chattanooga, for appellee.

## OPINION

ANDERSON, Justice.

In this capital case, the defendant, Harold Wayne Nichols, pled guilty to first-degree felony murder and was sentenced by a jury to death. At the sentencing hearing, the jury found two aggravating circumstances: (1) Nichols' five previous convictions for aggravated rape and (2) the fact that the murder occurred during the commission of a felony. Tenn.Code Ann. § 39–13–204(i)(2) & (7). The jury found that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt and sentenced the defendant to death. The defendant now appeals his sentence, alleging a number of errors in the sentencing phase.

We have thoroughly examined the record of this sentencing hearing and conclude that any trial errors committed during the sentencing phase were harmless error beyond a reasonable doubt and did not affect the jury's verdict of death. Although the use in this case of the aggravating circumstance that the murder occurred during the commission of a felony violated Article I, § 16, of the Tennessee Constitution and the Eighth Amendment to the United States Constitution, *see State v. Middlebrooks*, 840 S.W.2d 317, 346 (Tenn. 1992) (Drowota and O'Brien, JJ., dissenting), we conclude that the sentencing jury's consideration of the invalid circumstance was harmless error beyond a reasonable doubt. Accordingly, we affirm the jury's sentence of death.

## BACKGROUND

Because of the substantial publicity surrounding the murder and rape cases, the defendant requested a change of venue prior to trial. The trial court granted the change of venue to Sumner County, but only for the limited purpose of jury selection. The court then ordered the case back to Hamilton County for trial with the Sumner County jury. The trial reconvened in Hamilton County on May 9, 1990. Following the court's denial of the defendant's motion to suppress his videotaped confessions, the defendant entered pleas of guilty to the charges of first-degree felony murder, aggravated rape, and first-degree burglary.[1]

The trial proceeded to the penalty phase with the State relying on two aggravating

1. The State dismissed a charge of premeditated first-degree murder.

circumstances: (1) the murder's occurrence during the commission of a felony and (2) Nichols' previous convictions of violent felonies. Tenn.Code Ann. § 39–13–204(i)(2) & (7). The State introduced evidence concerning the nature and circumstance of the crime, which included the defendant's videotaped confession, testimony from the medical examiner about the nature and extent of the victim's injuries and the cause of her death, and testimony from the detective who had questioned the defendant on the videotaped interview. The Hamilton County Criminal Court Clerk also testified concerning the defendant's five prior convictions for aggravated rape.

The proof showed that on the night of September 30, 1988, the defendant broke into the house where the 21–year–old–victim, Karen Pulley, lived with two roommates in the Brainerd area of Chattanooga, Tennessee. After finding Pulley home alone in her upstairs bedroom, the defendant tore her undergarments from her and violently raped her. Because of her resistance during the rape, he forcibly struck her at least twice in the head with a two-by-four he had picked up after entering the house. After the rape, the defendant, while still struggling with the victim, struck her again several times with great force in the head with the two-by-four. The next morning, one of Karen Pulley's roommates discovered her alive and lying in a pool of blood on the floor next to her bed. Pulley died the next day. Three months after the rape and murder, a Chattanooga police detective questioned the defendant about Pulley's murder while he was in the custody of the East Ridge police department on unrelated charges. It was at this point that the defendant confessed to the crime. This videotaped confession provided the only link between the defendant and the Pulley rape and murder.

2. The record reveals that, prior to this capital murder trial, the defendant had been charged

The evidence showed that, until his arrest in January 1989, the defendant roamed the city at night and, when "energized," relentlessly searched for vulnerable female victims. At the time of trial, the defendant had been convicted on five charges of aggravated rape involving four other Chattanooga women.[2] These rapes had occurred in December 1988 and January 1989, within three months after Pulley's rape and murder. The convictions presented to the jury were as follows:

The defendant was indicted for feloniously engaging in sexual penetration of T.R. on December 27, 1988, by the use of force or coercion while the defendant was armed with a weapon—a cord. The defendant pled guilty to the offense of aggravated rape.

The defendant was indicted for feloniously engaging in sexual penetration—anal intercourse—with S.T. on the 3rd day of January, 1989, by the use of force or coercion while he, the defendant, was armed with a weapon—a pistol. The defendant pled guilty to aggravated rape.

The defendant was indicted for feloniously engaging in sexual penetration—fellatio—with P.A.R. on January 3, 1989, thereby causing personal injury to her. The defendant was also indicted for feloniously engaging in sexual penetration—vaginal intercourse—with P.A.R., on January 3, 1989. The defendant pled not guilty and the jury found the defendant guilty of aggravated rape in each case.

The defendant was indicted for feloniously engaging in sexual penetration, vaginal intercourse, with P.A.G. on December 21, 1988, by the use of force or coercion while he, the defendant, was armed with a weapon—a knife. The defendant pled not guilty and a jury convicted the defendant of aggravated rape.

with the aggravated rape and attempted rape of twelve victims other than Pulley.

The primary factors in mitigation presented by the defense were the defendant's cooperation with the police and the psychological effects of his childhood. Several persons who knew the defendant testified to his good character and passive nature.

The defendant also took the stand and testified about his life and the violent crimes he had committed. After his mother died of breast cancer when he was ten years old, he and his older sister were placed in an orphanage for six years by his father, who was apparently emotionally abusive, at least to the defendant's older sister. In 1976, just as he was about to be adopted, he was returned to his father. In 1984 he pled guilty to attempted rape, was sentenced to five years in prison and served eighteen months. Thereafter, he violated parole and served an additional nine months. He was married in 1986. At the time of the killing, he was employed by Godfather's Pizza as a first assistant manager.

Defendant testified that when he committed these violent criminal acts, a "strange energized feeling" that he could not resist would come over him and result in actions that he could not stop. He explained that he had not asked for help for his affliction or told anyone about his criminal activity because he was afraid he would lose everything. He expressed remorse for his actions but testified that, if he had not been arrested, he would have continued to violently attack women.

Finally, Dr. Eric Engum, a lawyer and clinical psychologist, testified that he had diagnosed the defendant with a psychological disorder termed "intermittent explosive disorder." According to Engum, a person suffering from this disorder normally experiences an increasing, irresistible drive that results in some type of violent, destructive act. Dr. Engum opined that the defendant's condition may have grown out of his anger at abandonment in childhood but conceded that the disorder was rare. According to him, the defendant would function normally in an institutional regimented setting but, if released, would repeat the violent behavior. The State offered Dr. Engum's investigating notes to prove that he was a member of the defense team acting as a lawyer searching for a defense, rather than an objective psychologist searching for a diagnosis.

After deliberating approximately two hours, the jury returned a verdict of death based on the two statutory aggravating circumstances. The defendant now appeals that sentence, and we address hereafter the errors alleged.

## I. CHANGE OF VENUE

The initial ground for appeal presents the Court with a question of first impression. As related in the preceding section, the defendant made a pretrial motion for change of venue, based on the extensive publicity that his arrest had generated in Hamilton County, Tennessee, and the surrounding area. The trial court granted the motion and moved the trial to Sumner County, some 125 miles away, but only for the limited purpose of selecting an unbiased jury. Once the Sumner County jury had been selected and sworn, the trial judge, over the defendant's objection, transferred the case and transported the jury back to Hamilton County for trial. Although the defendant originally moved for a change of venue, he now objects to what he characterizes as "two changes of venue" and contends that the trial court's procedure violated Article I, Section 9 of the Tennessee Constitution.

That provision of the state constitution grants a criminal defendant the right to trial by "an impartial jury of the County in which the crime shall have been committed." Although it literally refers to the place from which the jurors must be summoned, commonly known as the vicinage, the provision has been held to determine the venue of the trial as well. *See Chadwick v. State*, 201 Tenn. 57, 60, 296 S.W.2d 857, 859 (1956). In *State v. Upchurch*, 620 S.W.2d 540 (Tenn. Crim.App.1980), the trial court, faced with the defendant's objection to a change of venue, followed the provision's literal command by selecting a jury "of the County" where the crime occurred, but then moved the site of the trial. The Court of Criminal Appeals held that in the absence of a motion for change of venue, Article I, § 9, "has been interpreted to require that the accused be

tried in the county in which the crime has been committed." *Id.* at 542 (citing *Lester v. State*, 212 Tenn. 338, 370 S.W.2d 405 (1963); *Chadwick*, 201 Tenn. 57, 296 S.W.2d 857 (1956). Hence, Tennessee case law has interpreted the local vicinage requirement in our state constitution to include a concomitant requirement of local venue that cannot be changed except on application of or with the consent of the defendant. *Chadwick*, 296 S.W.2d at 859.

The State argues that by trying the defendant in the county in which the crime was committed, the trial court did not abuse its discretion, even though a jury was selected from a different county. The State relies on cases from two other jurisdictions in which selection of the jury from a county different than the trial venue was approved by the courts. *See State v. Chandler*, 324 N.C. 172, 376 S.E.2d 728, 735 (1989), and *State v. Forsyth*, 233 Mont. 389, 761 P.2d 363, 381 (1988). In both cases, however, selection of an out-of-county jury was specifically authorized by statute. Since Tennessee has no comparable statute, we must look to our constitution and rules of procedure for guidance.

The constitutional concern with the locality of trial has its origins in colonial history. When the British Parliament in 1769 attempted to try American colonists for treason in England, the Virginia House of Burgesses responded that such a plan would deprive colonists of "the inestimable Privilege of being tried by a Jury from the Vicinage, as well as the Liberty of summoning and producing Witnesses in such Trial." [3] The Declaration of Independence denounced the English monarchy "[f]or transporting us beyond Seas to be tried for pretended offenses." [4] The first Continental Congress lauded "the great and inestimable privilege of being tried by their peers of the vicinage...." [5] There can be little doubt that early Americans valued highly the right to be tried by local jurors in the place where the crime occurred.

These historical values are embodied in two provisions of the United States Constitution. Article III, Section 2 provides that "the trial of all crimes ... shall be held in the state where the said crimes shall have been committed." The Sixth Amendment then allows for "an impartial jury of the state and district wherein the crime shall have been committed." One court has observed that although Article III speaks to the site of the trial and the Sixth Amendment addresses the place from which the jury is selected, "[t]his distinction ... has never been given any weight, perhaps ... because the requirement that a jury be chosen from the state and district where the crime was committed presupposes that the jury will sit where it is chosen." *United States v. Passodelis*, 615 F.2d 975, 977 n. 3 (3rd Cir.1980).

Our Tennessee Constitution obviously reflects similar concerns and values. The dispositive question here is whether the defendant waived his rights under Article I, § 9, as to both venue and vicinage when he moved for a change of venue. We conclude that the change of venue motion constitutes a waiver of Article I, § 9, rights. Accordingly, unless the defendant is prejudiced, the administration of justice harmed, or the trial court abuses its discretion, no reversible error occurs when a trial court judge employs the unorthodox procedure used in this case in response to a defendant's motion for a change of venue.

Here, the trial judge attempted to solve the problem of possible taint to the jury pool from the extensive pretrial publicity that surrounded this case and the other charges against the defendant. The trial judge was, at the same time, commendably concerned that, if the trial were held in a distant county, the defendant's family and others would be prevented from attending. The decision to undergo the expense and disruption of moving the jury, rather than local witnesses and other interested persons, was obviously de-

---

3. *See* Blume, *The Place of Trial in Criminal Cases: Constitutional Vicinage and Venue*, 43 Mich.L.Rev. 59, 63–65 (1944); Wright, Federal Practice and Procedure: Criminal 2d § 301 (1982).

4. *See* U.S.C.A. Declaration of Independence, at 3; Blume, *supra*, at 66.

5. *See* Blume, *supra*, at 65.

signed to meet the core complaint of the defendant's motion. There is no showing by the defendant that prejudice resulted from bringing a jury from Sumner County to try his case in Hamilton County.

We conclude that in this particular case the procedure used by the trial judge was not reversible error. We note, however, that a statute which addresses the issue of summoning juries from another county, where there is a motion for change of venue, would ensure uniformity and fairness across the state and avoid error from excessive experimentation. We would encourage the legislature to address this issue.

### II. Psychological "Reports"

■ The defendant raises another difficult issue concerning the State's access to the defense psychologist's records of his interviews with Nichols and others. Dr. Eric Engum, hired by the defendant's counsel to evaluate Wayne Nichols, tested Nichols and interviewed him, his wife, his father, and his minister. After each interview, Dr. Engum wrote an extensive memorandum of the discussion and his conclusions. However, he did not write a summary report until the second day of trial, after the court had determined that the state should have access to all interview reports, as well as psychological test results, because they were prepared by a prospective witness. In this situation, we agree with the trial court's conclusion that the interview reports were properly discoverable.

The relevant reciprocal discovery provisions of Tenn.R.Crim.P. 16(b)(1)(B) are as follows:

> If the defendant requests disclosure [of the state's documents, tangible objects, reports of examinations and tests] ... the defendant, on request of the state, shall permit the state to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with the particular case, or copies thereof, within the possession or control of the defendant which the defendant intends to introduce as evidence in chief at the trial or which were prepared by a witness whom

the defendant intends to call at the trial when the results or reports relate to his testimony.

On the other hand, the rule precludes discovery of "reports, memoranda, or other internal defense documents made by the defendant, or his attorneys or agents ... or of statements made by ... defense witnesses ... to the defendant, his agents or attorneys." Tenn.R.Crim.P. 16(b)(2). Thus, while the results and evaluations of the standardized psychological tests contained in Dr. Engum's files were clearly discoverable, we must determine whether the interview notes are more accurately "reports" and "results" of mental examinations pertaining to Dr. Engum's testimony, subject to discovery under Rule 16, or whether they are "statements" made to defense counsel that are not subject to disclosure prior to trial. We find that, in the absence of any other records of Dr. Engum's evaluation of the defendant, the interview records are discoverable.

Because Dr. Engum is both a licensed lawyer and a psychologist, our first inquiry under Rule 16(b)(2) is whether Dr. Engum was acting in the capacity of an attorney or of a psychologist at the time the interviews took place and the notes memorializing those interviews were taken. The problem is complicated by Dr. Engum's apparent dual role in this case. He was seemingly both an expert psychological witness and a member of the defense team who helped to form strategy and evaluate witnesses. Dr. Engum testified that he was hired to evaluate Nichols's psychological status. Moreover, in a jury-out hearing he assured the court that he was "sitting here with [his] psychologist hat on." Therefore, his reports are not the undiscoverable work product of an agent or attorney of the defendant.

Furthermore, we find that these interview notes are significantly more than the statements of a prospective witness to defense counsel. They are the only records of interviews conducted as part of an ongoing evaluation of the defendant. Because a final report was not prepared until the second day of the hearing, and then only when it became apparent that the interview reports were admissible, the memoranda of the interviews

provided the most complete written psychological evaluation of Wayne Nichols. As such, we find that the interview reports are "results or reports of ... mental examinations," not mere statements, and that these reports formed the basis for Dr. Engum's testimony.

We thus conclude that when a psychologist or psychiatrist does not prepare a summary report, but instead relies on extensive memoranda to record not only observations and hypotheses but also evaluations, such records are discoverable under Rule 16(b)(1)(B). As the Court of Criminal Appeals has correctly observed, "To allow the defendant to evade the reciprocal discovery rule [by making no formal report and claiming that mere "notes" are undiscoverable] would effectively nullify the meaning of Rule 16(b)(1)(B)." *State v. Bell,* 690 S.W.2d 879, 883 (Tenn.Crim.App. 1985). In *Bell,* the trial court required the defendant's psychiatrist to submit to a deposition or to furnish a report in order to assure compliance with the reciprocal discovery provisions of Rule 16. Although we do not suggest that the trial court should require a formal report in every case, we do conclude, under the facts of this case, that Rule 16 authorized discovery of the available reports to the extent that they related to the testimony to be given at trial.[6]

### III. Jury Verdict Form

■ The defendant argues that the trial court erred in refusing to declare a mistrial when the jury returned a verdict form listing nonstatutory aggravating circumstances.

After deliberating approximately two hours, the jury returned a verdict of death. Although the State had relied upon and the judge had charged the statutory aggravating circumstances of felony murder and prior violent felony convictions, Tenn.Code Ann. § 39–13–204(i)(2) and (7), the jury listed as the sole "statutory" aggravating circumstances:

(1) First degree murder of Karen E. Pulley;

(2) The unfeeling brutality of the first degree murder of Karen E. Pulley;

(3) The lack of remorse; and

(4) The lack of respect of human rights.

The defendant moved for a mistrial because of this error. Concluding that the jury had a right to clarify its verdict, the trial court recharged the jury on the aggravating factors presented by the State and instructed them that they should "not take account of any other facts or circumstances" in deciding the penalty in this case.

The jury retired again and returned fifteen minutes later with an amended verdict form on which it had crossed out the erroneous material and listed the two statutory aggravating circumstances. The trial court then determined that the jury originally had not listed these two circumstances because it had assumed it need not copy statutory aggravating circumstances on the form. Each juror answered affirmatively when asked by the court whether, before reporting the verdict the first time, he or she had found (1) that each of the two statutory aggravating circumstances had been proved beyond a reasonable doubt, and (2) that these circumstances outweighed any mitigating circumstances.

■ When the jury reports an incorrect or imperfect verdict, the trial court has both the power and the duty to redirect the jury's attention to the law and return them to the jury room with directions to reconsider their verdict. *State v. Mounce,* 859 S.W.2d 319, 322 (Tenn.1993); *Meade v. State,* 530 S.W.2d 784, 787 (Tenn.Crim.App.1975); *Jenkins v. State,* 509 S.W.2d 240, 248 (Tenn.Crim.App. 1974). The trial court in this case was entitled to exercise this power and perform this duty and did not abuse its discretion in denying a mistrial.

The defendant argues that the verdict, as returned, indicated that the jury considered nonstatutory factors. He asserts, therefore, that the sentencing determination was so unreliable as to violate the Eighth and Fourteenth Amendments to the United States

---

**6.** *See State v. Vilvarajah,* 735 S.W.2d 837, 839 (Tenn.Crim.App.1987) (limiting discovery to results or reports that relate to the prospective witness's testimony).

Constitution.[7] We disagree. The trial judge ascertained that, prior to the return of the initial verdict, each juror had found the existence beyond a reasonable doubt of the two statutory aggravating circumstances upon which the State sought the death penalty. Each juror also confirmed that he or she had previously found that these two aggravating circumstances outweighed any mitigating circumstances. The jury verdict itself reported that the jury found the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.

■ The initial verdict's revelation that the jury considered factors beyond the statutory aggravating circumstances does not invalidate the verdict under the Eighth Amendment. Once a capital sentencing jury finds that a defendant falls within the legislatively-defined category of persons eligible for the death penalty, the jury is free to consider a myriad of factors to determine whether death is the punishment appropriate to the offense and the individual defendant. *California v. Ramos,* 463 U.S. 992, 1005, 103 S.Ct. 3446, 3456, 77 L.Ed.2d 1171 (1983); *Barclay v. Florida,* 463 U.S. 939, 948, 103 S.Ct. 3418, 3424, 77 L.Ed.2d 1134 (1983); *Zant v. Stephens,* 462 U.S. 862, 878, 103 S.Ct. 2733, 2743, 77 L.Ed.2d 235 (1983). It is clear from the record that the jury had found that the defendant met the statutory criteria for capital punishment.

■ Furthermore, the factors originally listed by the jurors as bases for the sentence are not irrelevant or improper but concern the circumstances of the crime and the character of the defendant. These are factors the jury may consider under the statute. *See* Tenn.Code Ann. § 39–13–204(c). Consideration of the character and record of the individual offender and the circumstances of the particular offense is also a constitutionally indispensable part of the process of inflicting the penalty of death. *Woodson v. North Carolina,* 428 U.S. 280, 303, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). For these reasons, we hold that the jury's consideration of the listed factors did not render the verdict

invalid or unreliable under the Eighth and Fourteenth Amendments.

## IV. Circumstances of the Offense—Admissibility

■ Because the defendant had already pled guilty to aggravated rape and felony-murder, he objected to the State's introduction of extensive evidence of the nature and circumstances of the crime. He insists that, in the sentencing hearing, only evidence relevant to aggravating and mitigating circumstances should have been allowed.

Tenn.Code Ann. § 39–13–204(c) permits, at a sentencing hearing, evidence "as to any matter that the court deems relevant to the punishment," including (but not limited to) "the nature and circumstances of the crime." In *State v. Teague,* 680 S.W.2d 785, 788 (Tenn.1984), *cert. denied,* 473 U.S. 911, 105 S.Ct. 3538, 87 L.Ed.2d 662 (1985), the defendant argued that the trial court erred by allowing the State to introduce evidence concerning the murder at the *re-sentencing hearing.* This Court approved the admission of evidence about "how the crime was committed, the injuries, and aggravating and mitigating factors." Because the defendant pled guilty, the sentencing jury here, as in *Teague,* had no information about the offense, absent the complained of evidence. A description of the crime and its circumstances was thus clearly admissible. Moreover, an "individualized [sentencing] determination" based on the defendant's character and the circumstances of the crime is constitutionally required. *See Zant v. Stephens,* 462 U.S. 862, 879, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235 (1983). In this case, the trial court permitted the introduction of evidence tending to "individualize" the case for the jury, while carefully limiting the evidence to testimony relevant to the crime. We find no error in this regard.

## V. Defendant's Confession—Admissibility

■ The trial court also admitted Nichols's videotaped confession to aggravated

---

7. Without clarification, defendant also alleges violation of the Sixth Amendment, and Art. I, §§ 8, 9, and 10 of the Tennessee Constitution.

rape and to the felony-murder for which he was sentenced. Nichols contends that the tape was improperly admitted because it was irrelevant to sentencing; he also claims that it was obtained in violation of his Fifth Amendment right not to incriminate himself. We find both objections without merit.

As to the first issue, the taped confession was highly relevant to sentencing because it fully described the "nature and circumstances of the crime." Thus, the confession was properly admitted under Tenn.Code Ann. § 39–13–204(c).

■ With regard to the claim that the confession was involuntary, a trial court's determination at a suppression hearing will not be overturned if there is any material evidence to support it. *See State v. Harbison,* 704 S.W.3d 314, 318 (Tenn.1986), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2261, 90 L.Ed.2d 705 (1986). We find ample evidence to support the court's finding that the confession in this case was admissible. The arresting officers read *Miranda* warnings to Nichols, and Nichols signed a written waiver of those rights. The officers disputed Nichols's testimony that he requested an attorney and that they coerced him into a statement, and the judge credited the officers' testimony. Finally, the videotaped confession shows the interrogating officer reading Nichols his *Miranda* warnings and Nichols again waiving those rights. Thus, the record supports the court's finding that the confession was voluntary and, therefore, admissible.

### VI. Evidence of Prior Conviction

The defendant next argues that the trial court erred by admitting evidence of his 1984 conviction for assault with intent to commit rape. The state did not list this prior conviction as an aggravating circumstance pursuant to Tenn.Code Ann. § 39–13–204(i)(2), but rather sought to use the conviction to impeach Nichols. The court admitted the evidence, not for impeachment purposes,[8] but to allow the state to rebut the defendant's argument that the 1988 and 1989 crimes were

sudden deviations from his normally placid behavior.

■ Prior bad acts, including crimes, may be admissible for purposes other than showing conformity with a character trait displayed by the prior bad act. Tenn.R.Evid. 404(b). Pursuant to Rule 404(b), in a hearing outside the jury's presence, the court must find that a material issue exists other than the defendant's propensity for conduct in conformity with the prior bad act. Furthermore, the court must exclude the evidence if the danger of unfair prejudice outweighs the probative value of the evidence.

■ Here, the trial court held such a hearing at the defendant's request to review the Rule 404(b) issue as it applied to his 1984 conviction. The court noted that Nichols had clearly indicated that the murder and rape in this case were the result of a sudden feeling that overcame him and that defense counsel had attempted to show that the crime was inconsistent with the defendant's otherwise passive nature. Instead of admitting the 1984 assault conviction to prove that the murder in this case conformed to defendant's previous violent behavior, the court admitted the conviction to rebut evidence that the defendant was a docile person. Prior bad acts are admissible to rebut a defendant's claim of having led a peaceful, normal life. *State v. Patton,* 593 S.W.2d 913, 917 (Tenn. 1979). We conclude that the admission of this probative evidence was not outweighed by the danger of unfair prejudice and that, with proper limiting instructions, it could be considered by the jury.

### VII. Parole Argument

■ The defendant contends that two statements made during the State's closing argument constituted an impermissible argument that a sentence of life did not mean life imprisonment because there was the possibility that the defendant could be released early on parole. The first statement occurred during initial closing argument. In context, it appears as follows:

---

8. The trial court presumably did not admit the conviction for impeachment purposes because the State had failed to give defense attorneys reasonable written notice of its intent to use the convictions, as required by Tenn.R.Evid. 609(a)(3).

But what do you do, what do you do with a man who's perpetrated that kind of crime? What do you do with a man who's committed senseless murder, and after he does it, instead of being remorseful, he rapes other women? What do you do with him? *He's been in the penitentiary. He got a five year sentence in '84 and he served eighteen months.* What do you do with him? What's left ... And you heard the psychologist say that if he's out he'll do it again. He even admitted, "Mr. Nichols, if you hadn't been arrested January 5, 1989, you would still be out there committing rapes," and he said yes.

Ladies and gentlemen, justice is doing what you have to do to make sure that Harold Wayne Nichols never rapes again and that he never murders again, whatever it takes.

(Emphasis added.) No objection was made.

The second statement occurred during the State's rebuttal. In context, this argument reads:

Mr. Moore says, "Prison is hell. Send him there." *Yeah, '84 they sent him there on a five year sentence and he served eighteen months and got out and raped again.* Sure, send him there.

If the death penalty, ladies and gentlemen, isn't applied in a case like this, when does it apply? A man who's shown even in being in prison that he's not going to change, he rapes and murders, and he goes out and does it again and again and again, and if he wasn't in jail right now he'd be doing it again.

(Emphasis added.) The prosecutor then argued that one of punishment's purposes is to "remove the individual from society so that another woman won't be raped again, another woman won't be murdered again." The defendant shortly afterward objected to this argument as implying that a life sentence is not a life sentence.

 Any references to parole possibilities during argument, even indirect references, are improper. *Smith v. State,* 527 S.W.2d 737, 738 (Tenn.1975); *Graham v. State,* 202 Tenn. 423, 304 S.W.2d 622 (1957). While the present argument could be interpreted as hinting at the idea that a life

sentence carries with it the possibility that defendant will rape and murder again, i.e., might be released into the free world, it does not clearly mention parole possibilities for defendant in the present proceeding. In addition, the argument, perhaps more directly, raises the issues of the failure of prior incarceration to affect the defendant's behavior and of the defendant's potential for future dangerousness. It was, in part, also a response to the defendant's argument that he would be completely harmless upon incarceration. *See State v. Bates,* 804 S.W.2d 868, 881 (Tenn.1991). In any event, to whatever degree improper, these arguments did not constitute error which prejudicially affected the jury's sentencing determination. *See State v. Hines,* 758 S.W.2d 515, 520 (Tenn. 1988).

### *VIII. Caldwell Error*

 The defendant contends that the prosecutor's argument that "the people of the State of Tennessee, speaking through their legislators, have asked that the death penalty be a punishment" diminished the jury's responsibility in making the sentencing decision in this case and violated *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). This statement was a reply to the defendant's argument that the only reason the death penalty was being sought was because "the prosecution wants Harold Wayne Nichols to die" and was meant to point out that the people of Tennessee through their elected representatives, not the prosecution, had determined that death was a possible punishment in such cases. The defendant made no contemporaneous objection to this argument. In its opening argument, the State emphasized that it was the jury's duty to make the sentencing decision in this case. Taken in context, the prosecution's argument did not lead the jury to believe that the responsibility for determining the appropriateness of defendant's sentence lay elsewhere. *See, e.g., State v. West,* 767 S.W.2d 387, 398–399 (Tenn.1989) (*Caldwell* error harmless beyond a reasonable doubt); *State v. Taylor,* 771 S.W.2d 387, 396 (Tenn.1989); *Teague v. State,* 772 S.W.2d 915, 926 (Tenn.Crim.App.1988).

## IX. Jury Instructions

Defendant Nichols next asserts that the jury instructions given by the trial court were deficient or erroneous in several respects.

### A. Burden of Proof

The defendant first challenges the trial court's instruction on the state's burden of proof. The court instructed the jury that it must find proof "beyond a reasonable doubt" and be convinced to a "moral certainty" of the existence of the aggravating circumstances and of the fact that they outweighed the mitigating circumstances. Nichols claims that a sentence based upon the jurors' "moral certainty" is a lower burden of proof than evidentiary certainty, and thus violative of the due process clauses of the state and federal constitutions.

In *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), the United States Supreme Court held unconstitutional an instruction equating reasonable doubt with "grave uncertainty" or "actual substantial doubt." The Court held that, when those definitions of reasonable doubt accompany an instruction that conviction is appropriate upon the jury's "moral certainty" of guilt, then a jury might impermissibly convict on less proof than required under the due process clause. We conclude, however, that the use of the phrase "moral certainty" by itself is insufficient to invalidate an instruction on the meaning of reasonable doubt. Whereas the instruction at issue in *Cage* required the jury to have an extremely high degree of doubt before acquitting a defendant, our instruction does not require "grave uncertainty" to support acquittal. When considered in conjunction with an instruction that "[r]easonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily upon the certainty of your verdict," we find that the instruction properly reflects the evidentiary certainty required by the "due process" clause of the federal constitution and the "law of the land" provision in our state constitution. *See also Odeneal v. State*, 128 Tenn. 60, 157 S.W. 419 (1913). The context in which the instruction

was given clearly conveyed the jury's responsibility to decide the verdict based on the facts and the law.

Nichols also challenges the trial court for failing to instruct the jury that there is a presumption of "no aggravating circumstances" in sentencing, similar to the presumption of innocence at the guilt phase of the trial. The court did, however, instruct the jury that it must determine the existence of any aggravating circumstances beyond a reasonable doubt. This instruction clearly implies that no aggravating circumstances can be presumed.

### B. Mitigating Factors

The defendant next alleges that the trial court failed to instruct the jury that it could consider nonstatutory mitigating factors. Nichols contends that the trial court's instruction specified only three statutory mitigating circumstances, leaving other mitigating factors to the jury's recollection, in violation of *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

In *Lockett*, the United States Supreme Court disapproved a death penalty statute that mandated death unless at least one of three mitigating factors specified by statute was found to exist. The Court held that "[t]o meet constitutional requirements, a death penalty statute must not preclude consideration of relevant mitigating factors." *Id.* at 608, 98 S.Ct. at 2967. Unlike the statute at issue in *Lockett*, our criminal code specifically permits consideration of mitigating circumstances other than those listed in Tenn.Code Ann. § 39–13–204(j)(1)–(8). *See* Tenn.Code Ann. § 39–13–204(j)(9). Moreover, we have held that the jury must be instructed that it can consider "any other facts or circumstances that are raised by the evidence that they find to be mitigating circumstances...." *State v. Hartman*, 703 S.W.2d 106, 118 (Tenn.1985), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3308, 92 L.Ed.2d 721 (1986).

In this case, after the trial court instructed the jury on three specific statutory mitigating circumstances, it also instructed the jury to consider "[a]ny other mitigating factor which is raised by the evidence." Moreover,

the defendant, although given the opportunity, offered no other specific mitigating circumstances to be charged to the jury. Thus, the court's instruction under Tenn.Code Ann. § 39–13–204(j)(9) complied with *Lockett*.

Next, the defendant argues that the court's instructions may have led the jury to believe that unanimity regarding the mitigating circumstances was required, in violation of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). This contention is without merit. *See State v. Smith*, 857 S.W.2d 1, 18 (Tenn.1993); *State v. Bates*, 804 S.W.2d 868, 882–83 (Tenn.1991) *cert. denied*, —— U.S. ——, 112 S.Ct. 131, 116 L.Ed.2d 98 (1991); *State v. Thompson*, 768 S.W.2d 239, 250–52 (Tenn.1989), *cert. denied*, 497 U.S. 1031, 110 S.Ct. 3288, 111 L.Ed.2d 796 (1990).

### C. Statutory Definition of Crime

█ The State relied upon, and the jury found, the aggravating circumstance that the murder was committed while the defendant was committing rape, etc. Tenn.Code Ann. § 39–13–204(i)(7). The trial court is required to provide the jury with the statutory definition of the felony relied upon by the State to prove aggravating circumstance (i)(7). *State v. Hines*, 758 S.W.2d 515, 521–524 (1988); *State v. Moore*, 614 S.W.2d 348, 350–351 (Tenn.1981). The trial court did not instruct the statutory definition of rape in connection with its charge on this aggravating circumstance. Earlier, however, in connection with its instruction on felony murder, it had instructed the jury on the elements of aggravated rape. It is generally harmless error where the court simply fails to repeat a definition already given, and we find that to be the case here. *See State v. Wright*, 756 S.W.2d 669, 675 (Tenn.1988); *State v. Carter*, 714 S.W.2d 241, 250 (Tenn.1986); *State v. Laney*, 654 S.W.2d 383, 388–389 (Tenn.1983); *compare State v. Hines, supra.*

### D. Re–Instruction on Mitigating Circumstances

█ After the jury returned the initial verdict form, which did not list the statutory aggravating circumstances, the trial court reinstructed the jury regarding aggravating circumstances. The court denied the defendant's request to recharge mitigating circumstances as well. The court ascertained that the corrected verdict was the verdict the jury had reached the first time they returned the form. There was no reversible error in the failure to recharge the mitigating circumstances or to include the words "beyond a reasonable doubt" in the questions asked the jurors. We have concluded the initial verdict was a legal verdict and the jury had a right to correct it under proper instruction.

### E. Law and Facts Instruction

█ Finally, the defendant objects to the trial court's instruction that:

> The jury are the sole judges of the facts, and of the law as it applies to the facts in the case. In making up your verdict, you are to consider the law in connection with the facts; but the Court is the proper source from which you are to get the law. In other words, you are the judges of the law as well as the facts under the direction of the Court.

Nichols argues that this instruction violated Article I, Section 19 of the Tennessee Constitution by interfering with the jury's absolute discretion in determining the law and the facts. The issue is without merit. *State v. Bane*, 853 S.W.2d 483, 489 (Tenn.1993); *State v. Black*, 815 S.W.2d 166, 186–87 (Tenn.1991).

To summarize, we find no reversible error in connection with the jury instructions given by the trial court in this case.

### X. Chronological Order

As a result of the serial rapes, the defendant faced forty charges growing out of some fourteen incidents. The murder of Karen Pulley occurred during the first such incident. The trial court denied defendant's motion to have the cases tried in chronological order. The defendant alleges that the prosecutor deliberately set out to try the cases out of chronological order solely to create an additional aggravating circumstance. The district attorney admitted that this was one reason for the order in which the cases were

scheduled to be tried. The defendant contends that allowing a prosecutor the discretion "to orchestrate a series of trials" in this fashion constitutes cruel and unusual punishment and violates due process and equal protection. He particularly claims that such discretion results in arbitrary and capricious imposition of the death penalty contrary to the principles of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

Tenn.Code Ann. § 39–13–204(i)(2) provides that the death penalty may be imposed where "[t]he defendant was *previously convicted* of one (1) or more felonies other than the present charge, whose statutory elements involve the use of violence to the person." (Emphasis added.) For purposes of this aggravating circumstance, the order in which the crimes were actually committed is irrelevant so long as the convictions have been entered before the sentencing hearing at which they were introduced. *State v. Caldwell,* 671 S.W.2d 459, 464–465 (Tenn. 1984); *cf. State v. Teague,* 680 S.W.2d 785, 790 (Tenn.1984) (conviction occurring after first capital sentencing hearing but before sentencing hearing on remand could be used to establish circumstance (i)(2) at resentencing hearing).

It goes without saying that the implementation of this aggravating circumstance may be subject to a certain degree of prosecutorial discretion; but implementation of the criminal laws against murder "necessarily requires discretionary judgments." *McCleskey v. Kemp,* 481 U.S. 279, 299, 107 S.Ct. 1756, 1769, 95 L.Ed.2d 262 (1987). Prosecutorial discretion of this nature does not offend the Eighth Amendment under *Furman,* which

> held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the criminal.

*Gregg v. Georgia,* 428 U.S. 153, 199, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976); *see also State v. Brimmer,* 876 S.W.2d 75 (Tenn. 1994). Where this fundamental discretion is involved, it will not be assumed that "what is unexplained is invidious," *McCleskey v. Kemp,* 481 U.S. at 309, 107 S.Ct. at 1778; and "exceptionally clear proof" is required before an abuse of discretion will be found in the operation of the criminal justice process. *Id.* at 299, 107 S.Ct. at 1769. No such showing has been made in this case. We further find that the record does not support defendant's assertion that the prosecutor's decision concerning the order of prosecution of the multiple charges facing the defendant violated either equal protection or due process. Accordingly, we find no merit in this issue.

### XI. Polling the Jury

The defendant argues that the trial court's failure to ask each juror whether he or she had found that the aggravating circumstances outweighed the mitigating circumstances *beyond a reasonable doubt* when it polled the jurors upon the return of the verdict [9] violates several of his constitutional rights (Sixth, Eighth, and Fourteenth Amendments of the United States Constitution; Art. I, §§ 8, 9, and 16 of the Tennessee Constitution). This issue is essentially a challenge of the verdict's reliability. In this respect, it should be noted, first, that the jurors were instructed that they must find that aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt and, second, that the verdict form itself states that the jury unanimously found that the statutory aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt. The court was only ascertaining that this was the jurors' verdict and its omission of the phrase "beyond a reasonable doubt" in this question during the polling does not invalidate an otherwise valid verdict.

---

9. The defendant incorrectly alleges that the trial court did not poll each juror as to whether he or she had found the statutory aggravating facts had been proven beyond a reasonable doubt. This question was asked each juror. Also, the trial court did poll the foreperson as to her finding on the weighing of mitigating factors.

## XII. Constitutionality of Tennessee Death Penalty Statute

The defendant raises the same constitutional issues that the Court rejected in *State v. Black,* 815 S.W.2d 166 (Tenn.1991) (statute creates a mandatory death penalty and death penalty is cruel and unusual). The issues have no merit.

## XIII. Notice of Aggravating Circumstance

The defendant contends he did not receive proper notice under Tenn.R.Crim.P. 12.3 of the conviction of aggravated rape (anal rape) as an aggravating circumstance. The State erroneously gave notice of Indictment 175487, alleging aggravated rape on October 24, 1989, which had been dismissed. The defendant, however, had pled guilty to Indictment 175433, aggravated rape [anal rape] of the same victim on the same day, October 24, 1989. The defendant was aware that he had pled guilty to aggravated rape on October 24, 1989, and was not misled or prejudiced by the State's error. *Cf. State v. Debro,* 787 S.W.2d 932 (Tenn.Crim.App.1989); *cf. also State v. Adams,* 788 S.W.2d 557 (Tenn. 1990) (when a detail of required notice is incorrect, issue is whether the notice was materially misleading and defendant has duty to inquire further).[10] There is no merit in the defendant's contention.

## XIV. Admissibility of Prior Convictions

▆ The defendant argues that none of the five prior convictions for aggravated rape could be used to prove aggravating circumstance (i)(2) because they were not "final" under Tenn.R.Crim.P. 32(e)[11] The defendant argues that the convictions were not final since no "judgments of conviction" had been entered. No judgments had been entered because the trial court had delayed sentencing at the defendant's request. The trial court held that "even under Rule 32(e) ...

we do have final convictions in those cases." *Cf. McCrae v. State,* 395 So.2d 1145, 1153–1154 (Fla.1981) (an adjudication of guilt is not necessary for "conviction" under Florida's similar aggravating circumstance). Tenn.Code Ann. § 39–13–204(i)(2) requires only a previous "conviction." The State argues that the indictments and minutes of the trial court offered to prove these convictions were admissible under either Tenn.R.Evid. 803(b) (Records of Regularly Conducted Activity) or 893(8) (Public Records and Reports). We agree and conclude that the convictions were admissible.

## XV. Newly Discovered Evidence

The defendant contends that newly discovered evidence entitles him to a new trial. After trial, defendant's counsel received allegedly new information relating to abuse of the defendant by his father, which allegations have been kept confidential.

▆ To obtain a new trial on the basis of newly discovered evidence, the defendant must establish (1) reasonable diligence in seeking the newly discovered evidence; (2) materiality of the evidence; and (3) that the evidence will likely change the result of the trial. *State v. Goswick,* 656 S.W.2d 355, 358–360 (Tenn.1983). The trial court found that the first prong had been met but the other two were not established. We agree that this alleged evidence, even if it could be produced as represented, would not change the results of the trial. Proof had already been introduced in the record that the defendant's father was abusive. Accordingly, we agree with the trial court's judgment denying a new trial.

## XVI. Harmless Error Analysis of Middlebrooks Error

▆ Sometime after the trial of this case, a Court majority concluded in *State v. Mid-*

---

10. *Debro* and *Adams* are decisions under Tenn. Code Ann. § 40–35–202(a) and Tenn.R.Crim.P. 12.3(a) (Notice in Noncapital Cases). Tenn. R.Crim.P. 12.3(b) (Notice in Capital Cases) requires only reference to the citation of the circumstance, not a listing of specific convictions. Technically, the material defendant complains of here was surplusage under the rule.

11. Tenn.R.Crim.P. 32(e) requires a judgment of conviction to set forth the plea, the verdict or findings, and the adjudication and sentence and be signed by the judge and entered by the clerk. Tenn.R.Evid. 803(22) states that judgments of previous felony convictions are not excluded by the hearsay rule.

*dlebrooks,* 840 S.W.2d 317, 346 (Tenn.1992) (Drowota and O'Brien, JJ., dissenting), that when a defendant is convicted of felony murder, the State's use of felony murder as an aggravating circumstance at the sentencing hearing violates the state and federal constitutions because the aggravating circumstance is a duplication of the crime itself and does not narrow the class of death-eligible defendants as is constitutionally required. There is no question that, in this case, the sentencing jury's consideration of the invalid felony-murder aggravating circumstance was state constitutional error. We must now determine whether the error was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *State v. Howell,* 868 S.W.2d 238 (Tenn.1993). In this particular context, an error is harmless beyond a reasonable doubt if an appellate court can conclude that the sentence would have been the same had the sentencing authority given no weight to the invalid aggravating circumstance. *Stringer v. Black,* —— U.S. ——, ——, 112 S.Ct. 1130, 1137, 117 L.Ed.2d 367 (1992); *State v. Howell,* 868 S.W.2d at 262.

We have recently stated that it is important, when conducting harmless error review,

> ... to completely examine the record for the presence of factors which potentially influence the sentence ultimately imposed. These include, but are not limited to, the number and strength of remaining valid aggravating circumstances, the prosecutor's argument at sentencing, the evidence admitted to establish the invalid aggravator, and the nature, quality and strength of mitigating evidence.
>
> ... [E]ven more crucial than the sum of the remaining aggravating circumstances is the qualitative nature of each circumstance, its substance and persuasiveness, as well as the quantum of proof supporting it. In that respect, the Tennessee statute assigns no relative importance to the various statutory aggravating circumstances. By their very nature, and under the proof in certain cases, however, some aggravating circumstances may be more qualitatively persuasive and objectively reliable than others....

*State v. Howell,* 868 S.W.2d at 260–61. That is particularly true of the aggravating circumstance remaining in this case. Tenn. Code Ann. § 39–13–204(i)(2) (previous convictions of felonies involving the use of violence to the person). In addition, as the present case illustrates, the effect and qualitative persuasiveness of the remaining aggravating circumstance on the sentence increases where there is proof of more than one prior violent felony conviction.

The State, here, offered proof that the defendant had committed five similar aggravated rapes within 90 days of Pulley's murder, and in three instances was armed with weapons including a cord, a pistol, and a knife. The modus operandi of the convictions was similar to the felony resulting in Pulley's murder. The defendant, when "energized," went out night after night, roaming the city, selecting vulnerable victims, eventually breaking into their homes and violently committing rape. The evidence supporting the remaining valid aggravating circumstance is undisputed and overwhelming.

Moreover, no inadmissible or erroneous evidence was introduced to establish the invalid felony-murder aggravating circumstance. The defendant pled guilty to felony-murder. The prosecution was then properly allowed to present evidence of the nature and circumstances of the crime in order to provide the jury enough information to make an individualized sentencing determination of the appropriateness of the death penalty. Elimination of the invalid felony-murder aggravating circumstance does not "remove any evidence from the jury's total consideration." *State v. Howell,* 868 S.W.2d at 261.

An examination of the State's argument also reveals that no great emphasis was placed on the fact that the murder occurred during the course of a felony. The bulk of the argument relative to aggravating circumstances focused on the defendant's prior criminal record and the predatory nature of the crimes.

Finally, we have examined the quality and strength of the defendant's mitigation proof in our analysis to determine the effect of the invalid aggravating circumstance on the sentence. Primarily the defendant's mitigation

proof related to his childhood environment, his character, and passive nature. The State offered evidence in rebuttal to show that a few years earlier, he had been convicted and sentenced to the penitentiary for an attempted rape. In addition, expert proof from Dr. Engum was offered to show that the defendant was suffering from a rare condition called intermittent explosive disorder. The State rebutted Dr. Engum's testimony, however, by offering proof that he acted in a dual role as a lawyer and member of the defense team searching for a defense, rather than as an objective psychologist.

After carefully considering the entire record, and the factors discussed above, we have determined, beyond a reasonable doubt, that the sentence would have been the same had the jury given no weight to the invalid felony-murder aggravating circumstance. Accordingly, the jury's sentence of death is affirmed.

### CONCLUSION

We have carefully considered the defendant's contentions as to the alleged errors occurring during the sentencing phase and conclude the defendant's death sentence should be affirmed.

■■■ In accordance with the mandate of Tenn.Code Ann. § 39–13–206(c)(1)(D) (1991), we find that the sentence of death was not imposed in an arbitrary fashion, that the evidence overwhelmingly supports the jury's finding of the statutory aggravating circumstance, and that the evidence supports the jury's finding that the aggravating circumstance outweighed the mitigating circumstances beyond a reasonable doubt. Our comparative proportionality review reveals that the sentence in this case is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and character of the defendant. *See State v. Cazes*, 875 S.W.2d 253 (Tenn.1994); *State v. House*, 743 S.W.2d 141 (Tenn.1987); *State v. McNish*, 727 S.W.2d 490 (Tenn.1987); and *State v. King*, 718 S.W.2d 241 (Tenn.1986).

The dissent suggests that no meaningful comparative proportionality review is possible without a procedure that includes objective criteria to determine proportionality. We disagree. A majority of this Court recently stated in *State v. Cazes, supra*, that we do not

> take lightly our duty to conduct a comparative review in each case.... Because we do not find it necessary in every case to compare in writing, detail by detail, all the specific cases or circumstances which are considered in our proportionality review, it does *not* follow ... that we have failed to perform an effective comparative proportionality review as outlined in *State v. Barber*, 753 S.W.2d 659, 663–668 (Tenn.1988).

*Id.* (emphasis in original).

So it is in this case. We have performed a thorough and searching proportionality review and conclude the sentence is not excessive or disproportionate.

The dissent also argues that the defendant is not among the worst of the bad because he had "lived a normal and productive life, except for the criminal episodes." Again, we emphatically disagree. The proof demonstrates the defendant is undoubtedly "among the worst of the bad," and clearly belongs among those who are eligible for the ultimate sanction. The defendant was convicted of attempted rape in 1984, served 18 months, was placed on parole, violated it and was returned to prison. He committed five aggravated rapes within 90 days of his rape and murder of Karen Pulley and in three instances was armed with weapons. He prowled the city night after night searching out vulnerable female victims. Moreover, both the defendant and Dr. Engum testified that if released, he would continue to roam and to rape. At the most, the evidence showed only that the defendant had been able to function without violence in a prison setting. It does not show that the rape and murder of Karen Pulley and the previous rape convictions were aberrations in an otherwise productive life. Accordingly, based on the nature of the crime and the character of the defendant, we conclude that the sentence in this case is neither excessive nor disproportionate to the penalty imposed in similar cases.

We, therefore, affirm the sentence of death. The sentence will be carried out as

provided by law on the 2nd day of August, 1994, unless otherwise ordered by this Court or by other proper authority. Costs of this appeal are assessed against the defendant, Harold Wayne Nichols.

DROWOTA and O'BRIEN, JJ., concur.

REID, C.J., dissents.

DAUGHTREY, J., not participating.

REID, Chief Justice, dissenting.

I dissent with regard to the majority's findings that the defendant waived his right to object to the jury under Article I, section 9 of the Tennessee Constitution, that the prosecutor's argument concerning parole was not prejudicial error, that the use of the invalid aggravating circumstance of felony murder as an aggravator was harmless error, and that death in this case is not a disproportionate punishment.

## CHANGE OF VENUE

The United States Constitution and the Tennessee Constitution guarantee to every person charged with the commission of a crime the right to a trial in the county where the crime was committed by an impartial jury selected from the citizens of that county. U.S. Const. amend. VI; Tenn. Const. art. I, §§ 6, 9. The venue for the trial of a criminal case can be changed only upon the application of the accused or upon the court's own motion with the consent of the accused. Tenn.R.Crim.P. 21(a). Change of venue can be accomplished in Tennessee only by following the statutory procedure. A defendant in a criminal case is entitled to a change of venue if for "causes, then existing, he cannot have a fair and impartial trial in the county" where the case is pending. T.C.A. § 20–4–203 (1980). If, upon the application of the accused, the court finds that the accused cannot have a fair and impartial trial in the county where the charge is pending, T.C.A. § 20–4–206 (1980) requires that the case be removed "to the nearest adjoining county free from the like exception."

This statutory procedure was not followed in this case. The trial court granted the defendant's application for a change of venue upon the necessary finding that the defendant could not have a fair and impartial trial in Hamilton County. The court, however, did not grant a change of venue. Instead, over the objection of the defendant, the court moved the proceedings to Sumner County from whence a jury was selected and transported back to Hamilton County, where the trial was held. There was no showing that Sumner County was the "nearest adjoining county" in which an impartial jury could be impanelled. In fact, Sumner County is five counties removed from Hamilton County. Consequently, despite the finding that the defendant was entitled to a change of venue, he was not in fact granted a change of venue. Instead of granting a change of venue, the trial court gave the defendant a change of venire, a procedure unknown to Tennessee, but permitted in some states by statute. *Odle v. Superior Court of Contra Costa County*, 32 Cal.3d 932, 187 Cal.Rptr. 455, 654 P.2d 225, 242 (1982) (Mosk, J., dissenting).

I do not agree with the majority's recommendation that the procedure followed in this case be authorized by statute. In my opinion, the procedure provided by present law is adequate and should be followed. A defendant has the right to a change of venue only when the state cannot afford him an impartial trial guaranteed by the constitution. If the trial must be moved in order to have a fair and impartial trial, the requirement that it be moved to the nearest county in which a fair and impartial trial can be had is entirely reasonable. It accommodates the accused's right to have the trial as close to the scene of the crime as possible, and it accommodates the public's interest in conserving time and expense incident to the trial.

I would find the unauthorized departure from the plain provisions of the statute to be reversible error.

## ARGUMENT CONCERNING PAROLE

The majority acknowledges that any reference to parole possibilities during argument, even indirect references, are improper. However, it characterizes the prosecution's argument as perhaps "hinting at the idea that a life sentence carries with it the possibility that defendant will rape and murder

again," and concludes the argument was not prejudicial error. *Supra* at 733.

Even though parole is not specifically mentioned in the prosecutor's argument, the import of the argument is dramatically clear—unless the defendant is sentenced to death he will be released from prison and rape again. During the prosecutor's initial closing statement, he rhetorically asked: "What do you do with him? He's been in the penitentiary. He got a five year sentence in '84 and he served eighteen months. What do you do with him? What's left? ... And you heard the psychologist say that if he's out he'll do it again." During rebuttal, the prosecutor remarked, "[The defendant's lawyer] says, 'Prison is hell. Send him there.' Yeah, '84 they sent him there on a five year sentence and he served 18 months and got out and raped again. Sure, send him there." Immediately after mentioning the defendant's previous release on parole, the prosecutor quoted Dr. Engum as saying that the defendant might "do it again" if released from prison. This remark was pointless except as an attempt to tell the jury that the possibility of release was a real danger in this case. Moreover, the prosecutor's mention of the defendant's previous parole in response to defense counsel's "prison is hell" argument certainly suggests that death would be the only appropriate sentence given the possibility of parole.

The argument was a comment upon the possibility of parole and was reversible error. *See Smith v. State,* 527 S.W.2d 737, 739 (Tenn.1975).

## INVALID AGGRAVATING CIRCUMSTANCE

This Court concluded in *State v. Middlebrooks,* 840 S.W.2d 317, 346 (Tenn.1992), *cert. dismissed,* —— U.S. ——, 114 S.Ct. 651, 126 L.Ed.2d 555 (1993), that when a defendant is convicted of felony murder, the State's use as an aggravating circumstance at the sentencing hearing of the fact that the murder occurred during the commission of a felony, violates the state and federal constitutions because the aggravator is simply a duplication of the crime itself, and therefore does not sufficiently narrow the class of death-eligible defendants. The sentence in *Middlebrooks* was reversed and the case remanded for resentencing because the Court was unable to conclude beyond a reasonable doubt that the use of the invalid felony murder aggravating circumstance was harmless error, even though the Court found that the remaining aggravating circumstance, that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of the mind,[1] was amply supported by the evidence. *Id.* at 347.

*Middlebrooks* was a significant decision in the evaluation of constitutional principles applicable to the sentence of death. It was decided against a background of decisions by this Court and the United States Supreme Court regarding harmless error in capital sentencing.

Prior to 1967, the federal courts assumed that harmless error analysis did not apply to federal constitutional violations, so that when a federal constitutional error occurred, reversal was the automatic remedy. James C. Scoville, Comment, *Deadly Mistakes: Harmless Error in Capital Sentencing,* 54 U.Chi. L.Rev. 740, 741–42 (1987) (hereinafter "Scoville, *Deadly Mistakes*"). Tennessee courts applied the same rule of automatic reversal to state constitutional errors as well. *See e.g. Dykes v. State,* 201 Tenn. 65, 296 S.W.2d 861, 862 (1956). In *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the U.S. Supreme Court approved the application of the harmless error test to federal constitutional errors in state criminal trials, but held that, in order to deem an error harmless, the reviewing court must be persuaded beyond a reasonable doubt, that the error complained of did not contribute to the verdict obtained. *Id.* at 24, 87 S.Ct. at 828. However, in *Chapman* the Court acknowledged that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error. *Id.* at 23, 87 S.Ct. at 827 (citing *e.g., Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (right to counsel); *Tumey v. State of Ohio,* 273 U.S. 510, 47

---

1. Tenn.Code Ann. § 39–2–203(i)(5) (1982).

S.Ct. 437, 71 L.Ed. 749 (1927) (right to impartial judge)).

The United States Supreme Court held in *Clemons v. Mississippi,* 494 U.S. 738, 752, 110 S.Ct. 1441, 1450, 108 L.Ed.2d 725 (1990), that the federal constitution is not violated by an appellate court's harmless error analysis when errors occur in a capital sentencing hearing, even when the error involved is the unconstitutional submission of an aggravating circumstance to the jury. The question under *Chapman,* in that context, is not whether the legally admitted evidence was sufficient to support the death sentence, but rather, whether the State has proven "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Satterwhite v. Texas,* 486 U.S. 249, 258–59, 108 S.Ct. 1792, 1798–99, 100 L.Ed.2d 284 (1988) (quoting *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828); *see also State v. Cauthern,* 778 S.W.2d 39, 47 n. 1 (1989), *cert. denied,* 495 U.S. 904, 110 S.Ct. 1922, 109 L.Ed.2d 286 (1990).

Error not rising to the level of a constitutional rights deprivation are judged for harm or prejudice under Rule 52(a) of the Tennessee Rules of Criminal Procedure and Rule 36(b) of the Tennessee Rules of Appellate Procedure. In several important ways, the test for harmlessness of constitutional errors differs from that for nonconstitutional errors. First, once a constitutional error is found, the burden shifts to the state to prove that it is harmless; the burden does not shift to the state for the nonconstitutional errors. Second, the reviewing court must be persuaded "beyond a reasonable doubt" that the error did not affect the trial outcome in order to deem the error harmless—a stricter standard of persuasion than for nonconstitutional error. Finally, a most significant difference is that some constitutional errors never can be deemed harmless, whereas any nonconstitutional error may be considered harmless in a particular case. Scoville, *Deadly Mistakes,* 54 U.Chi.L.Rev. at 744.

Later, in *Sochor v. Florida,* — U.S. —, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992), the Supreme Court concluded that an appellate court cannot fulfill its obligations of meaningful review by simply reciting the formula for harmless error. Justice O'Connor, concurring, observed that:

> In *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), we held that before a federal constitutional error can be held harmless, the reviewing court must find "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 24, 87 S.Ct. at 828. This is a justifiably high standard, and while it can be met without uttering the magic words "harmless error," see *ante* [— U.S. at ———, 112 S.Ct.] at 2122–2123, the reverse is not true. An appellate court's bald assertion that an error of constitutional dimensions was "harmless" cannot substitute for a principled explanation of how the court reached that conclusion.

*Id.,* — U.S. at —, 112 S.Ct. at 2123 (O'Connor, J., concurring).

Tennessee courts have applied the *Chapman* constitutional harmless error analysis to both state and federal constitutional errors. *See e.g. State v. Middlebrooks,* 840 S.W.2d at 347; *State v. Cook,* 816 S.W.2d 322, 326 (Tenn.1991). The invalidation of the aggravating circumstance in *Middlebrooks* was clearly constitutionally based, and therefore any *Middlebrooks* errors are subject to constitutional harmless error analysis. While not every error occurring in a capital sentencing hearing is of constitutional dimension, the line between constitutional and nonconstitutional error is often blurred due to the Eighth Amendment requirement for a heightened need for reliability. *See State v. Terry,* 813 S.W.2d 420 (Tenn.1991) (quoting *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality opinion), and *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion)). When evidence is introduced into the sentencing calculation that potentially undermines the Eighth Amendment reliability requirement, constitutional harmless error analysis should be employed. *State v. Terry,* 813 S.W.2d at 425 (because evidence of the invalid aggravating circumstance was introduced, and the defendant introduced strong mitigation proof and only one valid aggravator remained, this Court could not conclude that the error was

harmless *beyond a reasonable doubt*); *see also State v. Bobo*, 727 S.W.2d 945, 956 (Tenn.) *cert. denied*, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987) (evidence of an invalid aggravator was introduced; however, because there was little evidence in mitigation, and two other valid aggravators were clearly established, the error was found harmless *beyond a reasonable doubt*); *State v. Cone*, 665 S.W.2d 87, 95 (Tenn.) *cert. denied*, 467 U.S. 1210, 104 S.Ct. 2400, 81 L.Ed.2d 357 (1984) (jury heard evidence on an aggravator held invalid by the Court, but the error was harmless *beyond a reasonable doubt* because at least three other aggravators were clearly established); *State v. Campbell*, 664 S.W.2d 281, 284 (Tenn.) *cert. denied*, 469 U.S. 920, 105 S.Ct. 302, 83 L.Ed.2d 236 (1984) (jury heard evidence of non-violent prior felony convictions, but the Court held such error was harmless *beyond a reasonable doubt* because there was no mitigating evidence and two other valid aggravators); *compare State v. Williams*, 690 S.W.2d 517, 533 (Tenn.1985) (probability of prejudice resulting from the consideration of the improperly admitted evidence required reversal); *State v. Johnson*, 661 S.W.2d 854, 862 (Tenn.1983) (consideration of the improperly admitted evidence requires reversal because of the probability of prejudice); *State v. Adkins*, 653 S.W.2d 708, 716 (Tenn.1983) (the probability of prejudice from the wrongfully allowed evidence is so great reversal is required).

In *State v. Howell*, 868 S.W.2d 238 (Tenn. 1993), use of felony murder as an aggravating circumstance was found to be invalid pursuant to the *Middlebrooks* decision. However, even though the Court in *Middlebrooks* was unable to conclude that the use of the invalid aggravating circumstance was harmless error, 840 S.W.2d at 347, the Court began in *Howell* a harmless error analysis based on an examination of the number and weight of remaining aggravating circumstances, the jury instructions, the prosecutor's argument, the evidence admitted to establish the invalid aggravator, and the nature and quality of mitigating evidence. The Court's rationale in *Howell* was:

> In order to guarantee the precision that individualized sentencing considerations

demand and provide a principled explanation for our conclusion in each case, it is important, when conducting harmless error review, to completely examine the record for the presence of [these] factors which potentially influence the sentence ultimately imposed.

*State v. Howell*, 868 S.W.2d at 260–61.

My concurrence in *Howell* was based on the majority's analysis of these factors, upon which it concluded that beyond a reasonable doubt, charging the invalid aggravating circumstance did not affect the jury's decision to impose the sentence of death, and also on the fact that no evidence was admitted in support of the invalid aggravating circumstance that was not admissible to show the circumstances of the crime. *Id.* at 732–733 (Reid, C.J., concurring).

In the case before the Court, no evidence was admitted in support of the invalid circumstance, but the record does not, in my view, support the conclusion that the State has shown beyond a reasonable doubt, the jury was not influenced by the aggravating circumstance. Even under the *Howell* analysis, the admission of the invalid circumstance was not harmless error. The State relied on two aggravating circumstances to support the death penalty—previous convictions for aggravated rape, and the fact that the murder occurred during the commission of a violent felony. The jury was instructed to decide whether the aggravating circumstances were supported by the evidence, and whether they outweighed the mitigating evidence. At the sentencing hearing, evidence of the aggravating circumstances was offered, which included substantial emphasis on the circumstances of the crime itself. Evidence of mitigating circumstances was offered from the defendant, his family, coworkers, and friends as to his character, work background and attitude, and family history. He also submitted the testimony of a clinical psychologist who had diagnosed the defendant as having intermittent explosive disorder. The State's closing argument emphasized the felony murder aggravating circumstance at least as much as the aggrava-

ting circumstance of prior convictions. The most dramatic evidence of the content of the jury's instruction and deliberation, and the weight of the remaining aggravator, was their initial return of the juror death penalty verdict form. This form cited four "aggravating circumstances" concerning the murder itself, but no aggravating circumstances concerning the defendant's record of convictions. The death penalty verdict form cited the four aggravating circumstances as follows:

1. First-degree murder of Karen E. Pulley

2. Unfeeling brutality of the first-degree murder

3. Lack of remorse

4. Lack of respect of human rights

The trial judge sent the jury out to deliberate a second time, and only then did it insert the statutory language supporting the prior conviction aggravating circumstance onto the death penalty verdict form. These circumstances cast grave doubt on the jury's decision.

Our narrow task here is to determine whether the invalid aggravating circumstance of felony murder influenced the jury to impose a sentence of death. There is at the very least a reasonable possibility that the injection of the invalid felony murder aggravating circumstance into the weighing process by the jury contributed to the death sentence, and I cannot conclude that beyond a reasonable doubt the error did not contribute to the verdict. *See Chapman*, 386 U.S. at 24, 87 S.Ct. at 828.

Based on the same analysis, I would find that the evidence does not support the verdict that beyond a reasonable doubt the aggravating circumstance does not outweigh the mitigating circumstances. *See State v. Smith*, 857 S.W.2d 1, 21 (Tenn.) *cert. denied*, —— U.S. ——, 114 S.Ct. 561, 126 L.Ed.2d 461 (1993).

## COMPARATIVE PROPORTIONALITY REVIEW

The majority summarily states that the sentence of death is "neither excessive nor disproportionate." *Supra* at 739. I disagree with the majority's conclusion for two rea-

sons. The first is that no meaningful proportionality review was done in this case. The comparative proportionality review mandated by statute requires more of this Court than its general impressions of what sentences have been imposed in similar cases. *See State v. Howell*, 868 S.W.2d 238, 262 (Tenn. 1993) (Reid, C.J., concurring). This is the type of case that demonstrates the need for a definite and precise procedure that includes objective criteria for determining whether the sentence of death in a particular case is excessive or disproportionate in comparison to the penalties imposed in similar cases. A procedure whereby the conduct and character of criminal offenders can be categorized according to generally accepted levels of moral turpitude would provide a structure and standards needed by this Court, trial courts, defense counsel, and prosecutors to avoid the arbitrariness inherent in the present practice. *State v. Harris*, 839 S.W.2d 54, 84–85 (Tenn.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993) (Reid, C.J., dissenting).

The second reason for dissenting on this issue is that the evidence is not sufficient to support a finding that the defendant is among the worst of the bad. The circumstances of the offense in this case are egregious and could qualify the defendant for the ultimate sanction if only the criminal act is considered. However, T.C.A. § 39-13-206(c)(1)(D) requires that reviewing courts consider both the nature of the crime and the character of the offender. The evidence regarding the character of the defendant is not conclusive. Expert evidence shows that the defendant suffered from substantial mental and emotional problems. The other evidence shows that he lived a normal and productive life, except for the criminal episodes. In the absence of objective criteria whereby the defendant's conduct and character can be adjudged dispassionately, I cannot say that the penalty of death is not disproportionate to the penalty imposed in similar cases in which the death penalty was rejected. *See State v. Cazes*, 875 S.W.2d 253, 270 (Tenn.1994), (Reid, C.J., concurring and dissenting); *State v. Middlebrooks*, 840 S.W.2d 317, 354–55

(Tenn.1992) (Reid, C.J., concurring and dissenting).

### ORDER ON PETITION FOR REHEARING

PER CURIAM.

The appellant, Harold Wayne Nichols, has filed a petition for rehearing in this cause, which the Court has considered and concludes should be denied.

It is so ORDERED.

DAUGHTREY, J., not participating.