IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

MARCH 1996 SESSION


| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | C.C.A. # 02C01-9508-CR-00211 |
| Appellee, | * | SHELBY COUNTY |
| VS. | * | Hon. W. Fred Axley, Judge |
| PERRY A. CRIBBS, | * | (Death Penalty) |
| Appellant. | * | |

**FILED**

**March 26, 2008**

**Cecil Crowson, Jr.**

**Appellate Court Clerk**

For Appellant:

A. C. Wharton
District Public Defender
201 Poplar Avenue
Suite 201
Memphis, TN 38103-1947

W. Mark Ward
Assistant Public Defender
147 Jefferson, Suite 900
Memphis, TN 38103

For Appellee:

Charles W. Burson
Attorney General & Reporter

John P. Cauley
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN 37243-0493

James Wax and David Shapiro
Assistant District Attorneys General
201 Poplar Avenue, Third Floor
Memphis, TN 38103

OPINION FILED: _____


AFFIRMED


GARY R. WADE, JUDGE

## OPINION

The defendant, Perry A. Cribbs, was convicted of premeditated first degree murder, first degree murder during the perpetration of an aggravated burglary, first degree murder during the perpetration of aggravated robbery, aggravated burglary, and attempted first degree murder. The death penalty verdicts were based upon two of the aggravating circumstances prescribed by statute:

> (1)     the defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person; and
>
> (2)     the murder was committed while the defendant was engaged in committing a burglary.

Tenn. Code Ann. §§ 39-13-204(i)(2) & (7). The defendant was also convicted of aggravated burglary and attempted first degree murder; the trial court imposed consecutive, Range II sentences of ten and forty years respectively. Some weeks after the jury imposed the death penalty on the first degree murder convictions, the trial court set aside and the state agreed to dismiss convictions for premeditated first degree murder and first degree murder during the perpetration of aggravated robbery. In this direct appeal, the defendant has challenged the sufficiency of the evidence and has presented the following additional issues for our review:

> (1)     whether the eyewitness jury instructions were adequate;
>
> (2)     whether the crime scene video was unfairly prejudicial;
>
> (3)     whether the photographic lineup was unduly suggestive;
>
> (4)     whether references to the Bible, victim impact, parole eligibility, and mitigation during final argument qualified as prosecutorial misconduct;
>
> (5)     whether the state may use prior convictions for attempted second degree murder to establish the prior violent felonies aggravator, Tenn. Code Ann. § 39-13-204(i)(2);

(6)    whether the denial of specially requested jury instructions was erroneous;

(7)    whether the Tennessee death penalty statute violates the state or federal constitutions;

(8)    whether the presentation of evidence of a nonviolent felony to establish the prior violent felonies aggravator requires reversal of the death sentence; and

(9)    whether use of the underlying felony for this felony murder could be used as an aggravating circumstance under the state constitutional standards as defined in State v. Middlebrooks.

We affirm the convictions.  By the application of guidelines established by our supreme court, we conclude that errors in the penalty phase of the trial were harmless beyond a reasonable doubt.  In our view, the sentence of death for this defendant is neither excessive nor disproportionate, considering the nature of the crime.  The death penalty does not appear to have been arbitrarily imposed.  The evidence supports the application of one of the aggravating circumstances established by law.  Tenn. Code Ann. § 39-13-206.

Sometime between 1:30 A.M. and 1:45 A.M. on the morning of January 2, 1994, the victims, Sidney Harris and wife, Linda Harris, returned to their home from a visit with several friends.  After parking their automobile in the carport, the victims had just entered the kitchen when Ms. Harris was knocked to the ground by a black male who was armed with a revolver.  Mr. Harris described the assailant as about six feet and one inch, 240 pounds, with a moustache, large round nose, thick eyebrows, and hair about an inch long.  The assailant wore a light-colored stocking mask, denim overalls, and gloves.

Mr. Harris had wrestled the assailant to the floor when a second man, approximately six feet and three inches, 220 pounds, and armed with a shotgun,

3

intervened.  The second assailant, who also wore a light-colored stocking over his head, was clothed in a tan or gold-colored auto mechanic's jumpsuit.  The two men directed Harris to a chair in the den and told him that they intended to shoot him. Harris observed his assailants for twenty to thirty seconds before he was struck in the left shoulder and hand by a shotgun blast from the second assailant.  While acknowledging that there were no lights on the inside of the house, Harris claimed that he could see his assailants by the carport light.  Harris, apparently knocked unconscious for two to three minutes, awoke to find that his wife had been killed. He was able to walk to a neighbor's house and knock before he passed out. Hospitalized for twenty-two days, Harris identified a photograph of the defendants some four to six weeks later from a lineup compiled by Memphis police.  Harris testified that the defendant had fired the shotgun.  Later, Harris was able to confirm that a gold-faced Mickey Mouse watch with a leather band was among the items stolen from his residence.

At the time of the murder, the defendant resided with Jacqueline Cannon, the mother of his child.  Ms. Cannon testified that the defendant, wearing blue jeans and a blue denim shirt, had left their residence at about 9:00 or 10:00 P.M. on the night before the murder and did not return until after 1:00 A.M.  She described the defendant as covered in blood from a "hit."  She claimed that the defendant had admitted shooting a man and a woman.  The defendant explained that a man with whom Ms. Harris had developed a relationship wanted Mr. Harris dead; the defendant, who claimed that he was supposed to be paid for his "hit," told Ms. Cannon that he had killed both victims.  Ms. Cannon, who soon discovered from news reports that Mr. Harris survived the shooting, testified that she withheld information from police about the incident because of her fear of the defendant. She related that the defendant beat her sometime later when he suspected that she

4

had told a neighbor about the murder; she was hospitalized as a result of the beating. She told her brother about the murder; he called Crime Stoppers, who ultimately paid Ms. Cannon $900.00 for her information.

On the day after the murder, Ms. Cannon discovered a gold-faced Mickey Mouse watch with a leather band marked "genuine leather." When she asked about the watch, the defendant explained that he had taken it from the house where he shot the victim.

Sergeant Ronnie McWilliams of the Memphis Police led the investigation. The first information about the watch came from Ms. Cannon. When Sergeant McWilliams prepared a photographic lineup, Harris picked out a photograph of the defendant, tearfully identifying him as "the mother _____ that shot me!" Sergeant McWilliams had interviewed Harris the day after the murder. He testified that Harris had initially said that he could not identify either of the two suspects because they wore ski masks. Later, Harris had told a Memphis police officer that he could not get the "complexion" of the man with the shotgun. Sergeant McWilliams described Harris as being heavily sedated on the day after the murder and still in serious condition when he made the second statement about a week later.

Officer Donald Crow, a Memphis policeman, was with Harris when he was transported to the hospital shortly after the shooting. Officer Crow testified that Harris had described the first assailant in some detail and stated that he was wearing a black ski mask. Officer Crow testified that Harris said little about his second assailant other than the fact that he was tall, thin, and wore a black ski mask.

5

The victims' daughter had spent the night of the murder with Harris's sister-in-law. A video tape of the Harris residence showed the body of Ms. Harris in the kitchen, shotgun shells on the den floor, and bloodstains on a chair. There were several bullet holes in the wall to the left of the chair in the den. The house had been ransacked. A bedroom window had been left open. There appeared to be pry marks around most of the screens on the windows.

A shotgun wound to the left side of the head caused Ms. Harris's death. The medical examiner found wadding material on the left side of her neck and powder burns on the body.

After the guilty verdicts were returned, each side made an opening statement for the penalty phase of the trial. Thereafter, the state established that the defendant, twenty-three years of age at the time of trial, had been convicted of two counts of attempted second degree murder and one count of aggravated robbery some three years earlier. The state also proved that the defendant had been convicted of attempted second degree burglary in 1989.

The defendant, who had lived in Shelby County for about nine years, testified in his own behalf. Expelled from junior high school, the defendant served about four of the twelve-year sentence imposed for his prior convictions. While conceding that the crime "was terrible," the defendant proclaimed his innocence. He contended that his girlfriend, Ms. Cannon, had falsely implicated him in the crime: "The reason she said that [was] because me and her had got into it. She stole some money from me. I had wh[i]pped her real bad and told her I wasn't going to come around no more.... So she came in and said this on me." In an attempt to provide mitigating circumstances, the defendant, who had worked in construction for

6

his uncle, testified that he had a child whom he had seen seven or eight times since the arrest.

Initially, the defendant claims that the identification evidence was insufficient to support any of the three convictions. On appeal, however, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the triers of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). A guilty verdict, approved by the trial judge, resolves conflicting testimony in favor of the theory of the state. State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978). This court may set aside a conviction only when the "evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e).

Here, one of the victims, Sidney Harris, made an emotional and positive identification of the defendant as the person "that shot me" from a photographic lineup. At trial, he again identified the defendant as the second assailant. There was corroborative evidence. Jacqueline Cannon observed the defendant covered in blood on the night of the murder, described a watch that met the description of one taken from the Harris residence, and overheard the defendant say that he "had shot the lady and the man."

Here, the jury chose to accredit the testimony of the state's witnesses. That was their prerogative. There is sufficient evidence of the identity of the defendant, in our view, to support each of the convictions. See Jackson v. Virginia, 443 U.S. 307 (1979).

7

I

In a related issue, the defendant complains that the trial court inadequately charged the jury on the issue of eyewitness identification. Shortly after trial, our supreme court promulgated a new jury instruction on identification, holding that the value of such evidence depended upon several factors:

>  (1)     The witness' capacity and opportunity to observe the offender. This includes, among other things, the length of time available for observation, the distance from which the witness observed, the lighting, and whether the person who committed the crime was a prior acquaintance of the witness;

>  (2)     The degree of certainty expressed by the witness regarding the identification and the circumstances under which it was made, including whether it is the product of the witness own recollection;

>  (3)     The occasions, if any, on which the witness failed to make an identification of the defendant, or made an identification that was inconsistent with the identification at trial; and

>  (4)     The occasions, if any, on which the witness made an identification that was consistent with the identification at trial, and the circumstances surrounding such identifications.

State v. Dyle, 899 S.W.2d 607, 612 (Tenn. 1995).

Because the rule in the Dyle opinion specifically applies to those cases which were on appeal at the time of its release, the instructions provided by the trial judge on the issue of identity were clearly inadequate; and thus, this court must consider each of the Dyle factors in determining whether the error is harmless or prejudicial. Tenn. R. Crim. P. 52(a). The instruction actually given was as follows:

>  [T]he burden of proof is on the State to show that the defendant ... is the identical person who committed the alleged crime.... In considering the question of identity ..., the Jury may take into consideration the means and opportunity of identification, if any; whether it was light or dark; the distance intervening; the dress or clothing worn; the character and color of the same; the size, height, and color of the individual; whether known to him and if so,

8

how long, and if seen before, under what circumstances; whether running or moving rapidly, standing still, walking fast or slow at the time claimed to the person testifying; the color of the hair; hat worn; facial expression or features and appearance; whether with or without moustache and beard; whether [the] person ... was white, black, dark, yellow, or light color; masked or not; the voice and speech.

As to the first Dyle factor, the testimony established that the victim saw the defendant for as much as thirty seconds from a distance of five feet or less. Moreover, the jury instruction as to this factor was very much like that required in Dyle. The victim claimed that the light from the carport was adequate. The physical description the victim provided to police, while not ideal, generally comported with the appearance of the defendant.

As to the second factor, the victim expressed certainty of his identification during the photographic lineup. Officer McWilliams described the victim's physical reaction to a photograph of the defendant as "shaking ... almost crying." The photographic lineup, which took place within six weeks after the crime, does not appear to have been the least bit suggestive.

The third factor is less helpful to the state. The victim did select only the photograph of the defendant when first presented in the last of three separate photographic lineups. On the other hand, there was some evidence suggesting that the victim did not get a good look at his assailants because they wore stockings or black ski masks. The jury, however, obviously accepted the explanation offered by the state. That is, the initial descriptions of the assailants were made while the victim was seriously injured and at times he was receiving treatment, either in the ambulance or at the hospital; thus a less than accurate description under those circumstances was understandable.

9

As to the fourth factor, the victim identified the defendant in both the photographic lineup and later at trial. The victim claimed that he was certain that it was the defendant who had fired the shotgun. It would be natural to conclude that the victim had a heightened sense of awareness not only at the time of the offense but also at the photographic lineup and at trial. In our view, the identification procedures do not appear to be suggestive.

Under all of these circumstances, it does not appear that the inadequacy of the identification instructions affected the results of the trial. Thus, the defendant would not be entitled to a new trial on this basis.

II

The defendant next contends that the videotape introduced as evidence for the state was unfairly prejudicial. The defendant asserts that there was no valid reason to display the deceased victim lying in a pool of blood other than to inflame the jury. The trial court did suppress those portions of the tape which were the most gruesome. For example, the first deleted segment showed a portion of the victim's brain matter separated from her skull and scattered across the kitchen floor; a second segment displayed the shattered face and skull of the victim.

Rule 403 of the Tennessee Rules of Evidence permits trial courts the discretion to exclude relevant evidence if the probative value of that evidence is substantially outweighed by the dangers of unfair prejudice. See State v. Banks, 564 S.W.2d 947 (Tenn. 1978). The trial court must abuse its discretionary authority before this court may consider a reversal.

In this instance, the trial court clearly exercised discretion by admitting only the least gruesome of what is otherwise relevant evidence. As noted in Banks,

10

"shocking and horrifying the jury emotionally does not assist them in making a reasoned determination of how serious the crime is...." Id. at 952.

In the context of the trial and the circumstances of the crime, it is our view that the trial court did not abuse its discretion. The videotape of the crime scene was probative. While frightening, the videotape was not so inflammatory as to substantially outweigh its probative value. Similar evidence was admitted in State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993); while the supreme court ordered that an accompanying narration by the officer should have been excluded, it held that the probative value of the evidence outweighed any possible prejudice. Id. We cannot make a distinction between the facts in this case and those in Van Tran, also a death penalty case, and thus find no error. Other examples of death penalty cases in which crime scene videotapes were used are State v. Bates, 804 S.W.2d 868, 878-79 (Tenn. 1991), and State v. Payne, 791 S.W.2d 10, 19-20 (Tenn. 1990), aff'd, 501 U.S. 808 (1991).

### III

The defendant next complains that the photographic lineup was unduly suggestive. He bases the claim on the fact that police had informed the victim in advance that they had a suspect and that the photograph of the defendant, from the total of seven presented, was the only one that had a question mark by the identification number.

To be admissible as evidence, an identification must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification. Simmons v. United States, 390 U.S. 377 (1968). In Neil v. Biggers, 409 U.S. 188 (1972), the Supreme Court held that a

11

reliable identification procedure, even though suggestive, will not negate an identification of the defendant. The factors determining whether the procedure was too suggestive to accept as reliable were determined to be the following:

> (1)    the opportunity of the witness to view the criminal at the time of the offense;
>
> (2)    the witness' degree of attention;
>
> (3)    the accuracy of the witness' prior description of the individual;
>
> (4)    the level of certainty demonstrated by the witness at the confrontation; and
>
> (5)    the time between the crime and the confrontation.

Id. at 199.

Initially, a physical or a photographic lineup is the preferred means of identification. Either has been determined to be much less suggestive than a "showup," where the victim is either presented with the suspect or a single photograph of the suspect. State v. Terry M. Henderson, slip op. at 5, No. 01C01-9401-CR-00012 (Tenn. Crim. App., at Nashville, October 6, 1994). Beyond that, the extent to which an identification procedure may suggest a single suspect, even with the Neil v. Biggers factors, is largely subjective. If the procedure qualified as being suggestive, the defendant could have relied on several other facts to support his argument: that the encounter lasted less than a minute, that there was no direct light in the Harris residence, that the defendant wore a stocking over his face, and that Mr. Harris may have suffered diminished capacity due to his injuries. All of that would favor the suppression of the lineup identification. There exist, however, other more significant factors favorable to the state. There was proof that Harris did not know whether or not a photograph of the suspect was in the original array. The victim testified that the photograph of the defendant was among the third or fourth that he saw and that he immediately recognized the defendant as his assailant. All

12

of the photographs included profile and frontal views of black males with similar complexions, moustaches, and hair length. All of the individuals were dressed in t-shirts and two were wearing jackets. None appear to stand out from the others in any way. The victim looked at several other lineups which did not include photographs of the defendant and he was unable, of course, to identify anyone else. The victim stated that he paid no attention to the numbers underneath the individuals in the photographs before making the identification. To the objective eye, the question mark appears to be associated with the number underneath the photograph and not the individual therein.

In order to determine whether the pretrial photographic lineup was so unnecessarily suggestive as to violate constitutional due process, this court must examine the totality of the circumstances existing at the time of the identification. See Stovall v. Denno, 388 U.S. 293 (1967). Absent a showing by the defendant that the evidence preponderates against the judgment of the trial court, this court must defer to the ruling of the trial court. State v. Davis, 872 S.W.2d 950, 955 (Tenn. Crim. App. 1993). By the use of these guidelines, our assessment is that the process was not suggestive. Even if it had been, the photographic identification was still properly admitted into evidence by the use of the Neil v. Biggers criteria. The victim saw the defendant at a distance of less than five feet for over thirty seconds. Despite the stocking, the victim specifically recalled the facial features of the defendant. The victim described the defendant as having a moustache, thick eyebrows, and a large round nose. The height and weight descriptions were consistent with the defendant's actual appearance. The victim testified that a beam of light from the carport allowed for a clear view of his assailant.

IV

Having found no reversible error in our analysis of the trial, the judgments of conviction are affirmed. We now turn to those grounds alleged to have affected the propriety of the sentence of death.

Initially, the defendant contends that several comments made by the prosecutor during closing argument at the sentencing phase of the trial violated his constitutional right to a fair proceeding. Specifically, the defendant claims that the prosecutor made inappropriate Biblical, victim impact, parole eligibility and mitigation references. The state claims that all but one of the contentions have been waived. In the alternative, the state asserts that the prosecutor did not commit error, but if so, it was harmless.

In a recent, similar case of State v. Johnnie Lamont Dalton, this court ruled as follows:

> When a defendant alleges prosecutorial misconduct, the defendant is required to show that the argument was so inflammatory or the conduct so improper that it affected the verdict to his detriment. In reviewing an allegation of improper conduct, this court should consider several factors including the intent of the prosecutor, the curative measures which were undertaken by the court, the improper conduct viewed in context and in light of the facts and circumstances of the case, the cumulative effect of the remarks with any other errors in the record, and the relative strength or weakness of the case. The trial judge has wide discretion in controlling the argument of counsel. That discretion will not be interfered with on appeal in the absence of an abuse thereof.

Slip op. at 4-5, No. 01C01-9408-CR-00291 (Tenn. Crim. App., Nashville, July 11, 1995) (citations omitted); see also Coker v. State, 911 S.W.2d 357 (Tenn. Crim. App.), app. denied, (Tenn. 1995); State v. Norris, 874 S.W.2d 590 (Tenn. Crim. App. 1993).

14

Though the defendant failed to contemporaneously object to most of the claimed errors and neglected to raise the issue in his motion for new trial, obvious reasons for the application of the waiver rule, our supreme court has traditionally reviewed the merits of such claims in capital cases.[1]  So shall we.

During the prosecutor's closing argument, the defendant did lodge an objection to the prosecutor's religious references.  The trial judge overruled the objection.  The disputed portions of the argument are as follows:

> And I never liked, quite frankly, I never really feel comfortable using biblical references....  What I want to do--and the only reason I mentioned that is because I tell you quite frankly, I don't feel comfortable even mentioning the biblical references.  And the only reference I do want to make is it is written whether it is Koran, New Testament or Old Testament there is one consistent thing, that is: Whatever a man sows, so shall be reaped.  What that means is accountability.  It means that there are standards of conduct.  It means accountability what you sow, you reap.  And that is the only religious thing I get in there and I don't want to interject myself.  I just said that.  I didn't want anybody to get offended, you know, if I make a biblical reference but that it a very important part in our law, our law in the State of Tennessee.  Whatever a man sows, so shall he reap....  Mr. Cribbs needs to be accountable for his life.  Whatever a person sows, so shall he reap.

(Emphasis added).  Not only does the defendant question the propriety of the Biblical reference, he argues more strenuously that the error was exacerbated by the insinuation that the law of the state is rooted in the Bible.

It is well established in Tennessee that references to Biblical passages or religious law during a criminal trial are inappropriate.  See State v. Stephenson, 878 S.W.2d 530, 541 (Tenn. 1994) (judge's references to Biblical passage);

---

[1]Though the defendant failed to contemporaneously object to most of the claimed errors and neglected to raise the issue in his motion for new trial, in light of the nature of the case, it appears this court should nonetheless review the alleged misconduct.  See State v. Bigbee, 885 S.W.2d 797, 805 (Tenn. 1994); State v. Duncan, 698 S.W.2d 63, 67-68 (Tenn. 1985); State v. Strouth, 620 S.W.2d 467, 471 (Tenn. 1981).

Kirkendoll v. State, 281 S.W.2d 243, 254 (Tenn. 1955) (prosecutor's reference to religious law). Such references, however, do not constitute reversible error unless the appellant can clearly establish that they had some effect on the verdict. Stephenson, 878 S.W.2d at 541; Kirkendoll, 281 S.W.2d at 254.

In Kirkendoll, the prosecutor apparently referred to Mosaic law during a voir dire exchange with one of the prospective jurors. Our supreme court deemed the error harmless because the trial judge admonished the prosecutor against any further such comments. 281 S.W.2d at 254. In Stephenson, the court also ruled the error harmless because inappropriate remarks made by the trial judge, "Judge not lest ye be judged," were isolated references occurring well before the jury returned the death sentence. 878 S.W.2d at 541. In State v. Alfonzo E. Anderson, slip op. 15, No. 02C01-9410-CR-00243 (Tenn. Crim. App., at Jackson, Sept. 20, 1995), app. denied (Tenn. 1996), the prosecutor referred to the Bible as "the real law book" during closing arguments. The defense objected and the trial judge instructed the jury that this was just closing argument and that nothing the prosecution said should be taken as fact. Holding that the error was harmless, this court observed that the remarks were limited in scope and that the trial court took remedial measures. Id. at 15-16.

Under these guidelines, the prosecutor in this case committed error by making references to the Bible. When afforded an opportunity to minimize the error, the trial judge instead overruled the objection by the defense. Other than the instruction form later provided to the jury in which the judge stated that the court was the proper source of the law, there were no curative instructions. The defendant suggests that the prosecutor's intent in making the comments was to explain and justify the law of this state in term of Biblical maxims and to inform the jury that the

16

Bible could guide them in their decision under the law. The defendant claims this was an improper attempt by the prosecutor to inflame the jury by insisting that the law of the Bible, being the same as the law of the state, demanded the imposition of the death penalty.

While we admonish the trial court for having failed to take appropriate curative precautions, we view the "reap what you sow" argument more as a common metaphor for individual accountability rather than a Biblical mandate; many authorities would likely concede that this particular phrase logically applies to our criminal justice system. For that reason, we hold that the terminology had no effect on the verdict. The effort by the prosecutor to establish an association between religious and state law is, however, a matter of concern. It is one thing to argue that the law of this state is founded upon general principles of morality, but quite another to insist that the specific Bible verse is a part of the law of Tennessee. Nonetheless, the specific comments made by the prosecutor in this case did not, in our view, affect the verdict and would not, therefore, warrant a new sentencing hearing in and of themselves. Juries, by and large, are plenty astute; they usually understand that argument by counsel is just that and that it is the exclusive responsibility of the judge to provide instructions in the law. The trial court charged the law adequately; we are confident that the "Bible is the law" implication, in the context of the entire proceeding, had no impact on the verdict.

The defendant also contends that the prosecutor improperly inflamed the passions of the jury by references to the impact of the murder on the victim's family. The defendant objected to the comments on the ground that the argument exceeded the scope of the statutory aggravators. The judge overruled the objection. In this appeal, the defendant concedes that victim impact evidence is permissible

17

under our state and federal constitutions; he claims, however, that the evidence does not meet the statutory definition of "relevant evidence." Tenn. R. Evid. 401. The defendant insists that victim impact has no bearing on any of the statutory aggravating circumstances.

A significant portion of the prosecution's closing argument addressed the impact of the murder on the victim's family:

> [The defense] says that life without parole sentence is the same as death. I respectfully disagree. I'm sorry if I sound too strong. And I'm sorry if I raise my mouth. But there is a substantial amount of difference. Because little Michael Harris who is four years old is never going to be able to visit her mother. She will never ... hold her mother. She will never be able to cry to her mother. She will never be able to call her mother on the phone. She won't get letters from her. And she won't be able to write letters to her. She won't be able to call her on the phone or get calls for [sic] her. She won't be able to tell her about her boyfriends in life. Tell her about her problems. Tell her about her accomplishments.

> ***

> I can't and you can't bring back Linda Harris for her mother, for her husband, for her daughter. We can't do that. That is true. We can't give Michael Harris back her mother. But we can give justice. And that is what I ask you to do.

In State v. Brimmer, 876 S.W.2d 75, 86 (Tenn. 1994), the Tennessee Supreme Court expressly adopted the holding in Payne v. Tennessee, 501 U.S. 808, 827 (1991): remarks made during the sentencing phase by the prosecutor about the victim and the impact to his or her family do not per se violate the Constitution. It is true that the victim impact statements may not be relevant to the proof of any statutory aggravator. Yet the prosecutor's remarks simply point out what the jury already knew, or could have legitimately inferred, from other sources in the trial. Even if irrelevant, these remarks by the prosecutor would not, in our view,

18

have warranted a new sentencing hearing.

The defendant also argues that the prosecutor made improper references to the defendant's parole possibilities and the fact that he was released from prison early for a prior conviction:

> There are no winners. This is just a horrible situation. The defendant goes into custody and now you hear this is his testimony, in 1990 and he is convicted. In 1993 he is out. He's told it was a twelve-year sentence. The penitentiary system doesn't work.... No question that he got out early. You heard from him. It wasn't the state's proof. What happened and why it happened is something we may never know. But it does happen.

Our supreme court was faced with the same issue in State v. Nichols, 877 S.W.2d 722 (Tenn. 1994); in that case, the court noted that references, even indirect ones, to parole possibilities during argument are improper. Id. at 733 (citing both Smith v. State, 527 S.W.2d 737, 738 (Tenn. 1975), and Graham v. State, 304 S.W.2d 622 (Tenn. 1957)). The court observed that while references to the defendant's premature release on an earlier conviction could have "hinted" to the jury that a life sentence carried with it the possibility of early release, the prosecutor's remarks did not "clearly" mention parole possibilities for the defendant. Nichols, 877 S.W.2d at 733. The court also noted that the argument more directly commented on the failure of the defendant's prior incarceration to have a positive effect on his behavior (which of course could be an indirect argument about future parole). Id. In Nichols, however, our supreme court ultimately held that the references, to whatever degree improper, did not constitute prejudicial error affecting the outcome of the trial. Id.

Likewise here, the prosecutor, while submitting that the "system doesn't work," made no mention of parole possibilities. See State v. Hines, 758

19

S.W.2d 515, 520 (Tenn. 1988)("Had [the prosecutor] gone on to mention parole possibilities for defendant in this proceeding, he certainly would have been treading on forbidden ground."). It is only when the argument could be fairly interpreted as a reference to parole that it becomes improper. In our view, this argument would not have warranted a new sentencing hearing.

The defendant also argues that the prosecutor insinuated that the jury should not consider the defendant's mitigation because it was non-statutory. For example, the state argued, "what have you heard that is mitigation?"; "have you heard anything?"; and "we don't have mitigating [circumstances]." In Brimmer, 876 S.W.2d at 85, our supreme court held that such statements by the prosecutor do little more than "set out the State's interpretation of the proof." Accordingly, this aspect of the defendant's claim is meritless.

In summary, the Biblical references, while inappropriate in these circumstances did not, in our assessment, affect the results of the proceeding. The victim impact argument, while of questionable relevance, did not affect the death penalty verdict. The alleged references to parole did not likely violate precedent. The argument as to the lack of mitigating circumstances was not improper.

V

Next, the defendant insists that his two prior convictions for criminal attempt to commit second degree murder did not qualify as felonies "whose statutory elements involve the use of violence to a person." Tenn. Code Ann. 39-13-204(i)(2). The argument is based upon the statutory definition of criminal attempt:

> (a)     A person commits criminal attempt who, acting
> with the kind of culpability otherwise required for the

20

offense:

    (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

    (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

    (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

    (b) Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense.

    (c) It is no defense to prosecution for criminal attempt that the offense attempted was actually committed.

Tenn. Code Ann. § 39-12-101. The defendant points out that this statutory language does not include as an element "violence to person" and, thus, should not have been admitted to the jury. While the state has failed to brief the issue, insisting only that the evidence of the defendant's prior "crimes of violence was compelling" when, in fact, no evidence of the crimes appear in the record of the sentencing phase of the trial, we nonetheless reject the argument of the defense. The attempt statute requires the perpetrator to act "with the kind of culpability otherwise required for the [principal offense]." Tenn. Code Ann. § 39-12-101(a). Second degree murder necessarily includes violence:

    (1)    [a] knowing killing of another; or

    (2)    [a] killing of another which results from the unlawful distribution of any Schedule I or Schedule II drug when such drug is ... the proximate cause of the death of the user.

Tenn. Code Ann. § 39-13-210(a). This language supports the classification of the crimes as violent. In our view, this issue has no merit.

21

In a related issue the defendant claims the trial court undermined the defense by illustrating to the jury those statutory mitigating circumstances the defense did not actually raise. The defendant concedes that the supreme court has consistently recognized this error to be harmless absent a clear showing of prejudice. See State v. Smith, 893 S.W.2d 908, 921 (Tenn. 1994); State v. Teel, 793 S.W.2d 236, 252 (Tenn. 1990); State v. Carter, 714 S.W.2d 241, 251 (Tenn. 1986). He claims prejudice because the prosecutor read the list of statutory mitigators submitted by the defense and argued that the defendant failed to prove any of them. The prosecutor's actions appear to be little more than an attempt to evaluate the proof; accordingly, any error could be classified as harmless.

VI

Next, the defendant claims the trial judge should have instructed the jury that its sentence would actually be carried out to the extent provided by law. Specifically, the defendant suggests that without the instruction, the jury would speculate that the death penalty might not be carried out and that he might be released in a few years even if sentenced to life without parole. The defendant cites to an instance in the record where a prospective juror, who did not sit on the case, actually questioned the validity of the sentences. The defendant reasons that the comments by the prospective juror and those of the court in issuing its charge may have influenced jurors on the panel.

Our supreme court has consistently found this special request made by the defendant to be improper. See Van Tran, 864 S.W.2d at 481; State v. Caughron, 855 S.W.2d 526, 543 (Tenn. 1993); State v. Payne, 791 S.W.2d 10, 21 (Tenn. 1990), aff'd, 501 U.S. 808 (1991); State v. Melson, 638 S.W.2d 342, 367 (Tenn. 1982). So, without further comment, we reject the contention of the

22

defendant.

The defendant also insists that the trial court committed reversible error by refusing to instruct the jury that it could consider sympathy when deciding on a sentence. He argues that the trial court should not have charged the jury to render its verdict on the law and the facts rather than any sympathetic notions for the defendant. By rejecting this argument, the trial judge acted in perfect accordance with established precedent. See State v. Smith, 893 S.W.2d 908, 921 (Tenn. 1994); State v. Bigbee, 885 S.W.2d 797, 814 (Tenn. 1994); State v. Cazes, 875 S.W.2d 253, 168 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, we hold that this claim is without merit.

VII

While acknowledging that the supreme court has consistently upheld the death penalty statute under similar attacks, the defendant insists that our statute fails to meaningfully narrow the class of death eligible defendants. He contends that the death sentence is imposed capriciously and arbitrarily; that electrocution is cruel and unusual punishment; and that the appellate review process is constitutionally inadequate.

Based upon a long line of authority, we must reject each claim. See State v. Smith, 893 S.W.2d 908 (Tenn. 1994); State v. Brimmer, 876 S.W.2d 75 (Tenn. 1994); State v. Cazes, 875 S.W.2d 253 (Tenn. 1994); State v. Smith, 857 S.W.2d 1 (Tenn. 1993); State v. Black, 815 S.W.2d 166 (Tenn. 1991); State v. Boyd, 797 S.W.2d 589 (Tenn. 1990); State v. Teel, 793 S.W.2d 236 (Tenn. 1990); State v. Thompson, 768 S.W.2d 239 (Tenn. 1989).

23

Specifically, the defendant argues that our statutory scheme fails to meaningfully narrow the  class of death eligible defendants.  Our supreme court reviewed and dismissed this argument in State v. Howell, 868 S.W.2d 238, 258 (Tenn. 1993).

The defendant also contends that the statute is unconstitutional because district attorneys have unlimited discretion in whether to seek the death penalty or not.  Our supreme court rejected this argument in Brimmer, 876 S.W.2d at 86.  See also Cooper v. State, 847 S.W.2d 521, 536-38 (Tenn Crim. App. 1992).

Next, the defendant insists that the statute is unconstitutional because it is imposed in a discriminatory fashion.  This very argument was rejected by the supreme court in Brimmer, 876 S.W.2d at 87 n. 5.  See also State v. Evans, 838 S.W.2d 185, 196 (Tenn. 1992).

Next, the defendant complains that the denial of individual sequestered voir dire of prospective jurors in capital cases violates constitutional principles.  In Cazes, 875 S.W.2d at 269, our supreme court rejected this contention.  See also Caughron, 855 S.W.2d at 542.

Next, the defendant submits  that the death qualification process for prospective jurors creates a "prosecution-prone, guilt-prone jury."  Noting the contention has also been rejected by the  United States Supreme Court, our supreme court rejected this contention as meritless in Teel, 793 S.W.2d at 246.

The defendant alleges that he was unlawfully prohibited from addressing jurors' misconceptions about sentencing.  This argument has been

24

routinely rejected by our supreme court.  See Brimmer, 876 S.W.2d at 86-87; Cazes, 875 S.W.2d at 268; Black, 815 S.W.2d at 179.

Next, the defendant asserts the jury should have been informed of the effect of a non-unanimous verdict; that is, that the penalty shall be a life sentence. Tenn. Code Ann. § 39-13-204(h).  This contention was rejected by our supreme court in Brimmer, 876 S.W.2d at 87, Cazes, 875 S.W.2d at 268, and Smith, 857 S.W.2d at 22-23.  In a related argument, the defendant asserts that requiring the jury to unanimously agree on a life sentence violates the standards enunciated in McKoy v. North Carolina, 494 U.S. 433 (1990), and Mills v. Maryland, 486 U.S. 367 (1988).  This claim has consistently been found to be without merit by our supreme court.  See Brimmer, 876 S.W.2d at 87; Thompson, 768 S.W.2d at 250.

The defendant also insists that the statute is unconstitutional because the jury is not required to make the ultimate determination that death is the appropriate penalty.  Again, our supreme court has rejected this contention.  See Brimmer, 876 S.W.2d at 87; Smith, 857 S.W.2d at 22.

Next, the defendant complains about his being denied the opportunity to present the final closing argument in the penalty phase of the trial.  Our supreme court has rejected this contention in at least two prior cases.  See Brimmer, 876 S.W.2d at 87 n. 5; Caughron, 855 S.W.2d at 542.

The defendant also contends that death by electrocution is cruel and unusual punishment.  Our supreme court has repeatedly rejected this notion.  See Nichols, 877 S.W.2d at 737; Cazes, 875 S.W.2d at 268; Howell, 868 S.W.2d at 258.

The defendant submits that appellate review in death penalty cases is constitutionally inadequate. Again, our supreme court has found the claim to be meritless. See Harris, 839 S.W.2d at 77.

VIII

The defendant claims that the admission of a previous nonviolent felony conviction (attempted second degree burglary) during the penalty phase of the trial was erroneous. The state asserts that the defendant has waived the issue by failing to timely object to the evidence or raise it in the motion for new trial. The state also argues that the admission of this prior nonviolent felony conviction was harmless error.

Generally, a ground has been waived when the defendant fails to lodge an objection or fails to raise an issue on motion for new trial. Tenn. R. App. P. 3(e), 36(a); State v. Baker, 785 S.W.2d 132, 135 (Tenn. Crim. App. 1989); State v. Killebrew, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988). Because of the qualitative difference between death and other sentences, however, our supreme court has considered the merits of an issue even when the defendant fails to object or raise the issue in the motion for new trial. See Footnote 1. Accordingly, we must consider this issue on the merits.

Tennessee Code Annotated section 39-13-204(i) provides that the death penalty may be imposed solely upon a unanimous finding that one or more of the statutory aggravating circumstances has been proven beyond a reasonable doubt. One of the two aggravating circumstances found by the jury in this case was that the defendant had previously been convicted of a violent felony. The prior violent felony thus requires proof of a prior felony conviction "whose statutory

26

elements involve the use of violence to the person." Tenn. Code Ann. § 39-13-204(i)(2).

During the sentencing phase of the trial, the state introduced evidence that the defendant was previously convicted of two counts of attempted second degree murder, aggravated robbery, and attempted second degree burglary. Except for the attempted second degree burglary, these prior offenses involved violence against a person. Because the convictions of attempted second degree murder and aggravated robbery necessarily involve violence to the person, the state was precluded from introducing into evidence the underlying facts thereof based on the rule established in State v. Bigbee, 885 S.W.2d 797, 811 (Tenn. 1994). The state was not, however, prohibited from proving that the defendant's conviction of attempted second degree burglary, a crime that by statutory definition does not necessarily include violence to the person did, in fact, involve a violent act against a person.

In State v. Johnson, 661 S.W.2d 854 (Tenn. 1983), the jury sentenced the defendant to death based upon the finding of two aggravating circumstances: that the murder was committed while the defendant was engaged in committing a felony and that the defendant had previously been convicted of one or more violent felonies (second degree murder, grand larceny, and attempted burglary of an automobile). In holding that the trial court committed error by allowing the nonviolent convictions into evidence without any showing of violence to the person, our supreme court wrote that "the probability of prejudice resulting from the introduction of the evidence hereinabove held to have been wrongfully admitted is so great as to require a reversal of the death sentence." Id. at 862. See also State v. Adkins, 653 S.W.2d 708, 716 (Tenn. 1983) (prejudice resulted where state relied

27

upon convictions of second degree murder, larceny from the person, and attempt to commit a felony, but offered no proof of violence for the latter two); State v. Teague, 645 S.W.2d 392, 399 (Tenn. 1983); State v. Moore, 614 S.W.2d 348, 352 (Tenn. 1981).

Though the three violent felony convictions were properly before the jury, the trial court should not have allowed the jury to consider the conviction of attempted second degree burglary without any underlying proof of violence to the person. Johnson might be read to create a per se rule that when the state introduces nonviolent felonies in attempting to establish the aggravating circumstance of prior violent felonies, a remand for a new sentencing hearing is required. In our view, however, the ruling in Johnson does not require a remand for a new sentencing hearing in this case.

Our 1983 supreme court determined that a remand was necessary in Johnson because of "the action of the Supreme Court in the recent case of Zant v. Stephens, 456 U.S. 410, 102 S. Ct. 1856, 72 L.Ed.2d 222 (1982)." Johnson, 661 S.W.2d at 862. In Zant, the United States Supreme Court reviewed a death penalty case where the Georgia Supreme Court held one of the aggravating circumstances invalid but nevertheless affirmed the sentence of death. Zant, 456 U.S. at 415-17. The United States Supreme Court remanded to the Georgia Supreme Court to answer the question: "What are the premises of state law that support the conclusion that the death sentence in this case is not impaired by the invalidity of one of the aggravating circumstances found by the jury." Id. at 416.

For a time, the ruling in Zant created some uncertainty about whether an appellate court could uphold a death sentence when one of two or more

28

aggravating circumstances was found to be invalid. That question was resolved in Clemons v. Mississippi, 494 U.S. 738 (1990), where the United States Supreme Court "held that when a sentencing jury in a weighing state has relied, in part, on a constitutionally invalid aggravating circumstance, state appellate courts may reweigh the remaining aggravating circumstances against the mitigating evidence." Howell, 868 S.W.2d at 259 (discussing the holding in Clemons). Thus, the reason for the 1983 ruling in Johnson no longer applies. It is impossible, of course, for appellate courts to determine with absolute certainty whether a jury, no matter the quality or quantity of the aggravating circumstances, would have still imposed the death penalty when one factor is later found to have been invalid. Yet there is no per se rule for a remand under these circumstances. We must, therefore, attempt to assess whether the erroneous introduction of the attempted second degree burglary conviction affected the outcome of this case.

We acknowledge that Johnson has never been explicitly overruled. In State v. Campbell, 664 S.W.2d 281, 284 (Tenn. 1984), however, our supreme court addressed the same issue, ruling that the admission of a nonviolent felony was harmless beyond a reasonable doubt; the state had introduced evidence of an aggravated assault, a grand larceny and a second degree burglary. Id. at 284. Our supreme court held that there was a valid prior violent felony; thus that aggravating circumstance had been adequately established. Id.

In summary, it was error to admit proof of the conviction for attempted second degree burglary. We must, however, find the error to be harmless beyond a reasonable doubt. The proof is uncontested that the defendant had been convicted of two counts of attempted second degree murder and one count of aggravated robbery. All qualified as prior violent felonies. Moreover, the prosecution, during

29

opening and final argument, made no reference to the burglary. All remarks were directed to the three properly admitted offenses involving violence. Under these circumstances, the error was clearly harmless beyond reasonable doubt.

IX

The defendant contends that the death penalty in this case violates the mandates of State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992). The jury returned verdicts of guilt for premeditated first degree murder, first degree murder during the perpetration of an aggravated burglary, and first degree murder during the perpetration of an aggravated robbery. At the conclusion of the second phase of the trial, the jury returned death penalty verdicts on each of the three convictions. Several weeks later, during the motion for new trial, the trial court made the following observation:

> You are absolutely correct in pointing out that [the defendant] can't receive three death penalties. And, only one should stand. The terms available to the court are that the other verdicts are simply surplusage. It is discretionary with the court as a finder of fact, thirteenth juror, to strike the verdicts, and I will do that.

(Emphasis added). Thereafter, the court struck the verdicts in Count One and Three, the premeditated first degree conviction and the conviction for first degree murder during the perpetration of an aggravated robbery. The judgment of conviction allowed to stand was first degree murder during the perpetration of aggravated burglary; the suggestions made by counsel for the state played a key role in that determination.

During the motion for new trial, the defendant sought to have two of the death sentences set aside. The state responded to the trial court's comments by arguing the evidence supported all three convictions. When the trial court restated its intention to strike two of the convictions, the state asked that Counts

30

One and Three be stricken and that the conviction for murder during the perpetration of a burglary, for which the state argued the evidence was the strongest, stand. Thereafter, the trial court honored the state's request.

On appeal, the defendant argues that the jury's use of the felony as an aggravating factor under these circumstances violated the constitutional standards first enunciated in Middlebrooks. In Middlebrooks, our supreme court held that to satisfy state constitutional standards when the defendant is convicted of felony murder, the felony murder aggravator, Tenn. Code Ann. § 39-13-204(i)(7), may not be used as an aggravating circumstance supporting the imposition of the death penalty. 840 S.W.2d at 346. Here, the defendant argues that because he was ultimately convicted of felony murder, it was impermissible to use the felony murder aggravator as a basis for imposing the death penalty. In response, the state argues the following:

> When guilty verdicts on alternative counts are returned only one judgment of conviction and one punishment may result. But this does not mean that the trial court must elect which verdict should stand. ... The unmistakable intent of the trial court was to accredit the jury's verdict.

We interpret this as a concession that there can be only one judgment of conviction; but the state also insists that, in this case, there still remains multiple valid verdicts and that the jury verdict of guilty of premeditated murder precludes any Middlebrooks error.

Initially, the trial judge correctly pointed out that the defendant could not "receive three death penalties" where there was only one victim. In State v. Hurley, 876 S.W.2d 57, 70 (Tenn. 1993), our supreme court held the defendant could not be convicted of two murders for one killing. See also State v. Bell, 745 S.W.2d 858 (Tenn. 1988); State v. Zirkle, 910 S.W.2d 874 (Tenn. Crim. App.), app.

31

<u>denied</u>, (Tenn. 1995).  Multiple convictions for the single killing would violate double jeopardy principles.

Typically, when the defendant is convicted of multiple offenses which would violate double jeopardy, the trial judge will merge the lesser offense into the greater offense.  <u>See</u> <u>State v. Banes</u>, 874 S.W.2d 73, 81 (Tenn. Crim. App. 1993). The state's brief, however, has used the phrases "merge the convictions" and "dismiss the convictions" interchangeably.  These are different concepts which, in some instances, must be distinguished in order to achieve the desired result.

This court has described the principle of merger as applicable when there are alternative charges:  "the guilty verdict on the greater charge stands and the guilty verdict on the lesser charge merges into the greater charge."  <u>Banes</u>, 874 S.W.2d at 81.  Later, in <u>Zirkle</u>, 910 S.W.2d at 889, this court ruled as follows:

> A merger has been generally defined as follows:
>
> "The fusion or absorption of one thing or right into another;  generally spoken of a case where one of the subjects is of less dignity or importance than the other. Here the less important ceases to have an independent existence.
>
>          *  *  *
>
> When a man commits a major crime which includes a lesser offense, or commits a felony which includes a tort against a private person, the latter is merged in the former."  Black's Law Dictionary 1140 (6th ed. 1990).

"[M]erger may occur where one conviction is a lesser included offense of another conviction."  Raybin, Tenn. Crim. Practice and Pro. § 16.20.  Thus, the term is more appropriately used in considering greater and lesser included offenses.

It is tempting to apply a "merger" concept in this situation and

32

determine that felony murder simply "merged" into the premeditated murder, thereby avoiding a potential Middlebrooks error. Generally, when the defendant has been convicted of both premeditated murder and felony murder, trial judges either "merge" or "vacate" in order to eleminate the felony murder conviction and allow the premeditation murder conviction, which preempts the possibility of a Middlebrooks error, to remain. In Hurley, 876 S.W.2d at 70, the supreme court "vacated" the felony murder conviction when there were two murder convictions for a single death. In Bell, 745 S.W.2d at 863, our supreme court affirmed the trial judge's rejection of the felony murder conviction and approval of the premeditated murder conviction. In Zirkle, however, our court tacitly approved the trial court's "merging" a felony murder count into the premeditated murder count. So, our own opinion in Zirkle is some precedent for the conclusion that felony murder would as a matter of law automatically "merge" into premeditated murder, thus avoiding a Middlebrooks error; however, a precise application of the doctrine only permits the merger of a lesser offense into the greater one; and felony murder is not a lesser grade offense than that of premeditated murder.

In Wright v. State, 549 S.W.2d 682 (Tenn. 1977), our supreme court confirmed the test to determine whether an offense is lesser and included in the greater offense. Quoting the late Justice Weldon White in Johnson v. State, 397 S.W.2d 170, 174 (1965), the court ruled as follows:

> The true test of which is a lesser and which is a greater crime is whether the elements of the former are completely contained within the latter, so that to prove the greater the State must first prove the elements of the lesser.

Wright, 549 S.W.2d at 685-86.

Two years later, our supreme court again addressed the subject:

33

> We believe that the better rule, and the one to be
> followed henceforth in this State, is the rule adopted
> implicitly by this court in Wright v. State, supra, that, in
> this context, an offense is necessarily included in another
> if the elements of the greater offense, as those elements
> are set forth in the indictment, include, but are not
> congruent with, all the elements of the lesser.

Howard v. State, 578 S.W.2d 83, 85 (Tenn. 1979).

More recently, in State v. Trusty, 919 S.W.2d 305 (Tenn. 1996), the supreme court identified the two types of lesser offenses. A lesser included offense is one whose elements are a subset of the greater offense and which does not require proof of any element not included in the greater offense, as described above in Wright and Howard. A lesser grade or class of offense is established by statute. Trusty, 919 S.W.2d at 310-11. The grades of homicide are first degree murder, second degree murder, voluntary manslaughter, criminally negligent homicide and vehicular homicide.

The elements of felony murder are a "reckless killing of another committed in the perpetration of, or attempt to perpetrate any" of the enumerated felonies. Tenn. Code Ann. § 39-13-202(a)(2). The elements of premeditated murder are an "intentional, premeditated and deliberate killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Thus, depending upon the factual situation, the state could prove felony murder without having proved premeditated murder and vice versa. Thus, neither offense is a "lesser included" offense. Moreover, neither offense is a "lesser grade or class" than the other. Tennessee's statutory scheme provides that each offense is within the same class of homicide--first degree murder. They both are death eligible offenses; each is classified in our code as "first degree murder." See Tenn. Code Ann. § 39-13-202. The penalties for felony murder and premeditated murder are the same.

34

Because neither offense is greater or lesser than the other, the doctrine of merger does not resolve this issue. That is, if felony murder could be said to merge into premeditated murder, then there would be no Middlebrooks problem.

In our view, the trial judge, who might have avoided the Middlebrooks error by setting aside the felony murder convictions, nonetheless followed the proper technical procedure by vacating or "striking" two of the convictions rather than merging them. Vacate means "[t]o annul; to set aside; to cancel or rescind. To render an act void; as to vacate an entry of record, or a judgment." Black's Law Dictionary 1548 (6th ed. 1990). So, once the other convictions (including that of premeditated murder) were "struck," they were rendered "void."

In State v. Davis, 613 S.W.2d 218, 221(Tenn. 1981), our supreme court ruled that once a conviction is dismissed, "[t]here was not [a] legally valid verdict" to reinstate. We emphasize that in this case, the prosecution concurred in the trial judge's decision to strike the convictions for premeditated murder and for murder during the perpetration of a robbery. For the purposes of our appellate review, only the conviction for murder committed during a burglary, a felony murder, remains. As indicated, the effect of vacating the premeditated murder conviction retroactively nullified the applicability of the "commission of a felony" aggravating circumstance, Tenn. Code Ann. § 39-13-204(i)(7). We are constrained then to find that the trial court's action at the hearing on the motion for new trial created a Middlebrooks error.

In addition, the defendant argues the thirteenth juror rule also requires us to conclude a Middlebrooks error occurred. Rule 33(f), Tenn. R. Crim. P.,

35

provides, in part, as follows: "The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence. " In interpreting Rule 33(f), our supreme court has held as follows:

> Rule 33(f) imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case, and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment.

State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995) (emphasis added). "The purpose of the thirteenth juror rule is to be a 'safeguard ... against a miscarriage of justice by the jury.'" State v. Moats, 906 S.W.2d 431 (Tenn. 1995) (quoting State v. Johnson, 692 S.W.2d 412, 415 (Tenn. 1985) (Drowota, J., dissenting)). Here, because the trial court dismissed two of the convictions, the verdicts supporting the convictions obviously had not been approved by the trial judge as thirteenth juror. In fact, the trial judge made specific reference to that at the hearing on the motion for new trial. In Davis, our supreme court held that when the trial judge sets aside a verdict, he has not approved it as required by the thirteenth juror rule. 613 S.W.2d at 221. Without the trial court's approval, the verdict is invalid. Id. We are compelled to follow the precedent established in Davis. Again, the result is a finding of Middlebrooks error in the penalty phase of the trial.

The state argues that the trial judge implicitly accredited all three verdicts and that the thirteenth juror rule does not apply because the trial judge did not order a new trial. We must disagree with the state; a new trial was not necessary, or even permissible, because the trial judge fully approved of the verdict for murder in the commission of a burglary. In this appeal, we fully concur that the conviction was warranted; that would preclude, on double jeopardy principles, another trial on either of the two convictions that were set aside.

Because the trial judge did not approve the verdict for premeditated murder, that verdict is entitled to no weight.  The simple conclusion is that the only valid conviction remaining against the defendant for which the death penalty may be imposed is one for felony murder.  While the circumstances are unusual, we must hold that under the rule of Middlebrooks, the use of the felony aggravator during sentencing was error.

The error does not necessarily result in a reversal of the death penalty.  As stated previously in this opinion, our supreme court has developed a standard to determine whether the jury's use of an invalid aggravating factor in imposing death might qualify as harmless beyond a reasonable doubt.  State v. Howell, 868 S.W.2d 238, 259 (Tenn. 1993).  The Howell court considered four factors in determining whether the error was harmless:  (1)  the number and strength of the remaining valid aggravating circumstances; (2)  the prosecutor's argument at sentencing; (3)  the evidence admitted to establish the invalid aggravator; and (4)  the nature, quality, and strength of mitigating evidence.  Id. at 261.

Our supreme court applied the Howell analysis to determine whether the erroneous application of the felony murder aggravator constituted reversible error in at least eight cases.  See State v. Hines, 919 S.W.2d 573 (Tenn. 1995), cert. denied, _____ U.S. _____, 117 S.Ct. 133 (1996); State v. Walker, 910 S.W.2d 381 (Tenn. 1995); State v. Hartman, 896 S.W.2d 94 (Tenn. 1995), cert. denied, _____ U.S. _____, 117 S.Ct. 88 (1996);State v. Smith, 893 S.W.2d 908 (Tenn. 1994); Barber v. State, 889 S.W.2d 185 (Tenn. 1994);State v. Nichols, 877 S.W.2d 722 (Tenn. 1994); State v. Cazes, 875 S.W.2d 253 (Tenn. 1994);State v. Howell, 868 S.W.2d 238 (Tenn. 1993).  In all but Walker and Hartman, the error was been found to be harmless beyond a reasonable doubt.

In Barber, 889 S.W.2d at 188-90, there was only one remaining aggravator, that the murder was heinous and atrocious; because proof of the remaining aggravator was so overwhelming, our supreme court found the error to be harmless beyond a reasonable doubt. In making its ruling, the court reasoned the state did not emphasize the invalid aggravator, no new evidence was admitted to establish the invalid aggravator, and the mitigating evidence was insubstantial Id. In Nichols, 877 S.W.2d at 738-39, the only remaining aggravator was the commission of prior violent felonies, Tenn. Code Ann. § 39-13-204(i)(2). It was established by proof of five aggravated rapes. Id. As in Barber, the supreme court found no reversible error because proof of the aggravator was so overwhelming; the remaining Howell factors were also favorable to the state. Id.

This case is closely akin to Barber and Nichols because there is only one remaining valid aggravator. As in each of those two cases, the proof of the single remaining aggravating circumstance is overwhelming. Moreover, the remaining Howell factors also support a finding of harmlessness beyond a reasonable doubt. The first of the four factors, the number and strength of the remaining valid aggravators, has been described as follows:

> [W]e necessarily consider the number of remaining valid aggravating circumstances ...; but even more crucial than the sum of the remaining aggravating circumstances is the qualitative nature of each circumstance, its substance and persuasiveness, as well as the quantum of proof supporting it.

Howell 868 S.W.2d at 261 (emphasis added). Here, the jury had a basis for finding that the defendant had three prior violent felony convictions. See Tenn. Code Ann. § 39-13-204(i)(2). The state introduced proof that the defendant had previously attempted two second degree murders and an aggravated robbery. Thus, the remaining proof of this aggravator was both "persuasive" and well supported by an adequate "quantum of proof." Id. at 261. The state need only prove that the

defendant has been convicted of one prior violent felony to establish this aggravating circumstance; there was a surplus in proof of two. In Nichols, our supreme court observed that "the effect and qualitative persuasiveness of the remaining aggravating circumstance [prior violent felonies] increases where there is proof of more than one prior violent felony conviction." 877 S.W.2d at 738.

The second Howell factor is the prosecutor's argument at sentencing. During opening and closing argument, the prosecutor did not emphasize the felony murder aggravator. In fact, much of the argument was geared toward addressing the defendant's prior violent felonies. For example, the state argued during closing that the defendant had been "convicted of three violent crimes. We didn't go into the details of all of those crimes. Don't believe it would be proper to do that. But we do know he was convicted." The state did not emphasize the felony murder aggravator nearly as much as the prior violent felonies; that weighs against a finding of prejudicial error. In Nichols, 877 S.W.2d at 737, the court found the Middlebrooks error to be harmless in part because "[a]n examination of the State's argument ... reveal[ed] that no great emphasis was placed on the fact that the murder occurred during the course of a felony. The bulk of the argument relative to aggravating circumstances focused on the defendant's prior criminal record and the predatory nature of the crimes."

The third factor is whether any evidence was admitted to establish the invalid aggravating circumstance. The only proof of the felony murder was during the guilt phase of the trial. None was presented during the penalty phase. That favors the state in the harmless error analysis. "Elimination of the invalid felony-murder aggravating circumstance [would not have] 'remove[d] any evidence from the jury's total consideration.'" Nichols, 877 S.W.2d at 738 (quoting Howell, 868

39

S.W.2d at 261).

Finally, we must consider the nature and quality of the mitigating evidence. The only such evidence was the defendant's assertion that he still had family members with whom he kept contact; that he was well-behaved while he was incarcerated; and that he had some work history. The defendant also proclaimed his innocence of the crime. In our view, this evidence qualified as little more than minimal. As in Howell, where the Middlebrooks error was found to be harmless, there was no "mitigating evidence relating to the good character of the defendant ." Howell 868 S.W.2d at 262. The death penalty in Nichols was affirmed, despite one invalid aggravating circumstance, because the defendant did not present any persuasive mitigation evidence. This case is similar in that regard. We conclude, therefore, that the Middlebrooks error was harmless beyond a reasonable doubt. That the evidence would have supported a conviction of premeditated murder, had the trial judge not set it aside, serves to buttress our conclusion. So does the fact that there was more than one underlying felony to support the felony murder conviction; that is, both attempted murder and aggravated burglary were established by the proof. In theory, one could have been used as an element of the felony murder conviction, i.e., aggravated burglary. The other could have been utilized as an aggravating circumstance under Tenn. Code Ann. § 39-13-204(i)(7) despite the Middlebrooks rule:

> Where, as in the instant case, a felony not underlying the felony murder conviction is used to support the felony murder aggravating circumstance, there is no duplication. Furthermore, under these facts the aggravating circumstance as applied restricts the sentencer's discretion to those who kill while in the perpetration of multiple felonies, a class of murderers demonstrably smaller and more blameworthy than the general class of murderers eligible for the death penalty under the previous felony murder statute in Tenn. Code Ann. § 39-2-202(a)(1982). Under these circumstances, where a felony other than that used to prove the substantive

40

offense is used to establish the aggravating circumstance, there is no constitutional prohibition against the use of the aggravating circumstance in § 39-2-203(i)(7) to support the imposition of the death penalty for felony murder.

State v. Hines, 919 S.W.2d 573, 583 (Tenn. 1995) (emphasis added).

Finally, the sentence is neither excessive nor disproportionate to the penalty imposed in similar cases. The sentence does not appear to have been imposed in an arbitrary fashion. Proof of the valid, remaining aggravating circumstance outweighs the proof of mitigating circumstances.

Accordingly, the judgment is affirmed.

_____
Gary R. Wade, Judge

CONCUR:

_____
Joe B. Jones, Presiding Judge

_____
William M. Barker, Judge

41